REDACTED COPY
ORIGINAL FILED UNDER SEAL

1  John Karl Buche (SBN 239477)
2  Sean M. Sullivan (SBN 254372)
   BUCHE & ASSOCIATES, P.C.
3  875 Prospect, Suite 305
4  La Jolla, California 92037
   Telephone: 858.459.9111
5  Facsimile: 858.459.9120
6  jbuche@buchelaw.com
7  ssullivan@buchelaw.com

8  Attorneys for Plaintiff,
   GARY-MICHAEL DAHL
9

10              UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
11             WESTERN DIVISION (LOS ANGELES)
12                                          SJO (RZx)
                    CASE NO.
13                  CV10 0551
14                               )  COMPLAINT FOR:
15 GARY-MICHAEL DAHL, an         )  (1)  INFRINGEMENT OF U.S.
   individual,                   )       PATENT NO. 5,228,716;
16                               )  (2)  INFRINGEMENT OF U.S.
17          Plaintiffs,          )       PATENT NO. 5,476,282;
                                 )  (3)  TRADEMARK
18        v.                     )       INFRINGEMENT;
19                               )  (4)  UNFAIR COMPETITION –
   SWIFT DISTRIBUTION, INC.      )       THE LANHAM ACT;
20 d/b/a ULTIMATE SUPPORT        )  (5)  DILUTION OF A FAMOUS
21 SYSTEMS, INC., a California    )       MARK;
   corporation; MICHAEL BELITZ,  )  (6)  MISLEADING ADVERTISING –
22 an individual; ROBIN SLATON,  )       CAL. BUS. & PROF. CODE
23 an individual; DOES 1-20,     )       17500, ET SEQ;
   inclusive,                    )  (7)  UNFAIR COMPETITION – CAL.
24                               )       BUS. & PROF. CODE 17200, ET
25          Defendants.          )       SEQ.;
                                 )  (8)  UNFAIR COMPETITION –
26                               )       COMMON LAW;
27                               )  (9)  BREACH OF CONTRACT;
                                 )  (10) PROMISSORY ESTOPPEL;
28

                          - 1 -
                        COMPLAINT

1
2
3
4
5
6
7
8
9

)  **(11)  FRAUDULENT INDUCEMENT;**
)  **(12)  CIVIL CONSPIRACY;**
)  **(13)  MISAPPROPRIATION OF**
)         **TRADE SECRETS.**
)
)   **REQUEST FOR PRELIMINARY**
)   **INJUNCTION**
)
)   **JURY TRIAL DEMANDED**
)
)
)
)

10    COMES NOW plaintiff Gary-Michael Dahl, and hereby alleges for his

11  Complaint against defendants Swift Distribution, Inc. d/b/a Ultimate Support

12  Systems, Inc, Michael Belitz, and Robin Slaton, and DOES 1 through 20, inclusive,

13  and against each of them, as hereinafter alleged, on personal knowledge as to

14  plaintiffs' own activities, and on information and belief as to the activities of others,

15  as follows:

16                              **JURISDICTION AND VENUE**

17    1.    This is a complaint for, *inter alia*, patent infringement arising under the

18  patent laws of the United States, Title 35 of the United States Code, and trademark

19  infringement under the Lanham Act, Title 15 of the United States Code.

20    2.    This Court has jurisdiction over the claims asserted herein under 28

21  U.S.C. § 1338.

22    3.    Personal jurisdiction and venue for this action are proper in this Court

23  pursuant to 28 U.S.C. § 1391(b)-(c), and 1400(h), in that each of the named

24  Defendants resides in this judicial district and/or has, directly or indirectly,

25  conducted, directed toward, and/or solicited business within the State of California,

26  and within this judicial district, and/or otherwise purposefully availed itself of the

27  benefits of this forum.  The claims set forth herein, including acts of infringement

28  that give rise to the within claims, arise out of activities relating to such actual and/or

                                        - 2 -

                                   **COMPLAINT**

1 | solicited business activities and/or benefits.

2 | **PARTIES**

3 | 4.      Plaintiff Gary-Michael Dahl ("Dahl" or "Plaintiff"), is an individual

4 | maintaining his principal residence in Houston, Texas.

5 | 5.      Upon information and belief, Defendant Swift Distribution, Inc. d/b/a

6 | Ultimate Support Systems Inc. ("Ultimate"), is a corporation organized and existing

7 | under the laws of the State of California, having its principal place of business at

8 | 2451 W. 205th St., Suite B102, Torrance, California 90503.

9 | 6.      Upon information and belief, proper service of process may be made on

10 | Ultimate's registered agent in California:  Michael J. Belitz, 2451 W. 205th St., Suite

11 | B102, Torrance, California 90503.

12 | 7.      Upon information and belief, Defendant Michael Belitz ("Belitz"), is an

13 | individual residing in the State of California, and who may be served with process at

14 | 2451 W. 205th St., Suite B102, Torrance, California 90503, or wherever else he may

15 | be located.

16 | 8.      Upon information and belief, Defendant Robin Slaton ("Slaton"), is an

17 | individual residing in the State of Colorado, and who may be served with process at

18 | ████████████████        Fort Collins, Colorado ████, or wherever else he may

19 | be located.

20 | 9.      Dahl is unaware of the true identity or capacity of those defendants sued

21 | herein by the fictitious names DOES 1 through 10, inclusive, or are currently unable

22 | to ascertain, prior to discovery, that there is sufficient evidence to state a cause of

23 | action as against individuals or entities who may be known to Dahl, wherefore Dahl

24 | hereby reserves the right to amend the instant complaint to substitute the true name

25 | and capacity of each such fictitiously named defendant when and as the same

26 | becomes known to Dahl, or when sufficient evidence has been obtained through

27 | discovery to permit Dahl to allege a cause of action herein as against such fictitiously

28 | named persons.

- 3 -

**COMPLAINT**

## FACTUAL BACKGROUND
## THE PATENTS-IN-SUIT

10.     Dahl is the inventor and owner of U.S. Patent No. 5,476,282 (issued Dec. 19, 1995), entitled "CONVERTIBLE TRANSPORT CART" ("the '282 Patent"). A true and correct copy of the '282 Patent is attached to this Complaint as Exhibit A and is fully incorporated herein by reference.

11.     Dahl is also the inventor and owner of U.S. Patent No. 5,228,716 (issued Jul. 20, 1993), also entitled "CONVERTIBLE TRANSPORT CART" ("the '716 Patent"). A true and correct copy of the '716 Patent is attached to this Complaint as Exhibit B and is fully incorporated herein by reference. Together, the '282 Patent and the '716 Patent are collectively hereinafter referred to as "Patents-in-Suit."

12.     Through various distributors, Dahl is in the business of marketing and selling products covered by, *inter alia*, the Patents-in-Suit, namely the Multi-Cart® collapsible cart ("the Cart"). The Cart is capable of being manipulated into eight (8) different configurations, depending on the size, weight and shape of the item(s) to be transported. A website printout displaying the Cart is attached hereto as Exhibit C.

13.     Dahl, a successful professional musician, designed the Cart to move vast amounts of music, sound, and video equipment quickly and easily. Now one of the most famous selling equipment moving carts or dollies in the music and broadcast industries, the Cart is even used by national TV networks, pro sports teams, and major corporations.

### PLAINTIFF'S TRADEMARK

14.     On July 28, 1998, the U.S. Patent and Trademark Office duly and legally issued Registration Serial No. 2,177,291, for the mark "Multi-Cart" to Dahl (hereinafter the "Dahl's Mark"), a copy of which is attached hereto as Exhibit D.

15.     Dahl is the owner of rights in Dahl's Mark sufficient to bring this action.

16.     Dahl has continuously and extensively sold the Cart in commerce since at least 1997.

- 4 -

**COMPLAINT**

1      17.    Dahl annually attends the "National Association of Music Merchants"
2  ("NAMM") trade show, the largest music product trade show in the United States,
3  which takes place in Anaheim, California.

4      18.    Through trade show participation and other marketing efforts, the Cart
5  has gained popularity around the world, not only within the music industry, but the
6  many other industries as well.

7      19.    Dahl has invested substantial time, energy and resources in the
8  development of the Cart and Dahl's Mark for use with the cart.

9      20.    As a result of Dahl's continuous development of Dahl's Mark and the
10  Cart have acquired a high level of goodwill within the various above-described
11  industries, particularly within the music industry.

12              **DEFENDANTS' INFRINGING & TORTIOUS ACTS**

13      21.    Upon information and belief, Defendants are manufacturers and/or
14  distributors of various products, including a collapsible cart which strongly resembles
15  the Cart.

16      22.    Upon information and belief, Defendants, and each of them,
17  manufacture, promote, advertise, offer for sale, sell, import and distribute in the
18  United States, as well as in this district, among other things, products, namely carts,
19  which are covered by the claims of the Patents-in-Suit (collectively, "Defendants'
20  Infringing Products").  Copies of advertisements for some of Defendants' Infringing
21  Products are attached hereto as Exhibit E.

22      23.    In January of 2010, Dahl first became aware that Defendants were
23  promoting Defendants' Infringing Products at the 2010 NAMM Show.  Photographs
24  of Defendants booth displaying Defendants' Infringing Products at the 2010 NAMM
25  Show are attached herewith as Exhibit F.

26      24.    Defendants promoted Defendants' Infringing Products as the "Ulti-
27  Cart," a nearly identical name as Dahl's Mark which Dahl uses on the official Multi-
28  Cart®-brand carts.

- 5 -

**COMPLAINT**

1    25.    Dahl and the named Defendants are not strangers.  Dahl first met
2    defendant Slaton as early as 2001 to discuss designs related to the Cart.  As part of
3    this consultation, Slaton executed a Confidential Non-Disclosure Agreement, dated
4    November 26, 2001 ("Slaton NDA").  Likewise, Slaton promised to keep all
5    disclosures confidential and not to use such information in a manner which would
6    harm Dahl.

7    26.    More recently, Dahl became acquainted with defendant Belitz.  Dahl
8    originally began discussing licensing a product unrelated to this suit to Ultimate.
9    Dahl met with Belitz, Ultimate's Chief Executive Officer.  By this time, defendant
10   Slaton was also working with Ultimate as the Director of Design & Marketing.
11   Defendants expressed extreme interest in licensing and distributing the Cart.

12   27.    In order to continue discussions relating to Defendants desired license to
13   distribute the Cart, Dahl required Belitz to sign Confidentiality and Non-Disclosure
14   Agreements.  Slaton was still covered under the terms of the Slaton NDA.  Belitz
15   executed a Confidential Non-Disclosure Agreement, dated July 22, 2008 ("Belitz
16   NDA").

17   28.    As part of each of their consultations with Dahl, Defendants had access
18   to highly sensitive confidential and proprietary information, including but not limited
19   to product design specifications, product sourcing information, manufacturing
20   information, factory costs, factory locations, factory contacts, names of current
21   distributors, royalties, dealer costs, sales volume, distribution channels, customer
22   lists, and more.

23   29.    By signing their respective Confidentiality and Non-Disclosure
24   agreements, Defendants promised to keep all disclosures confidential and not to use
25   such information in a manner which would harm Dahl.

26   30.    Upon information and belief, Ultimate, Slaton and Belitz assisted each
27   other with designing, advertising, manufacturing, promoting, offering for sale,
28   distributing, or selling Defendants' Infringing Products.

- 6 -

**COMPLAINT**

31.    None of the named Defendants are, and never have been, authorized by Dahl to use, manufacture, sell, offer to sell, distribute, or import products covered by the Patents-in-Suit.

32.    Upon information and belief, Defendants have performed the acts complained herein willfully and with knowledge of the fact that they would infringe Dahl's rights and cause harm to Dahl.  Further, Defendants' actions were undertaken with the intent to interfere with Dahl's business and unfairly trade upon Dahl's goodwill in the Dahl's Mark.  On information and belief, each of the Defendants worked with one another and took meaningful steps to misappropriate Dahl's highly sensitive confidential and proprietary information for profit in violation of Dahl's rights.

## COUNT I

*(Infringement of U.S. Patent No. 5,228,716)*

33.    Dahl realleges and incorporates by reference paragraphs 1 through 32 of this Complaint as if set forth fully herein.

34.    Defendants, by manufacturing, using, selling, offering to sell, instructing to use, and/or importing Defendants' Infringing Products, infringe and continue to infringe, whether directly, indirectly, literally, or by equivalency, one of more of the claims of the '716 Patent, in violation of 35 U.S.C. § 271.

35.    Dahl has complied with 35 U.S.C. § 287, and has placed notice of the '716 Patent on all products covered by the '716 Patent.

36.    Upon information and belief, Defendants acts of infringement as set forth above are deliberate and willful, thus rendering this case "exceptional" under 35 U.S.C. § 285.  Dahl seeks enhanced damages, costs, and attorney fees by reason of Defendants' conduct.

37.    As a consequence of the Defendants' infringing actions regarding the '716 Patent, Dahl has suffered monetary damages in an amount not yet determined, and Dahl will continue to suffer irreparable harm and monetary damages in the future

- 7 -

**COMPLAINT**

1  unless and until Defendants' infringing activities are enjoined by this Court.

2      38.    As a proximate result of Defendants' infringement of the '716 Patent,

3  Dahl has been, and will continue to be, injured in his business and property rights,

4  and is entitled to recover damages for such injuries pursuant to 35 U.S.C. § 284 in an

5  amount to be determined at trial.

6                              **COUNT II**

7                    *(Infringement of U.S. Patent No. 5,476,282)*

8      39.    Dahl realleges and incorporates by reference paragraphs 1 through 38 of

9  this Complaint as if set forth fully herein.

10     40.    Defendants, by manufacturing, using, selling, offering to sell, instructing

11 to use, and/or importing Defendants' Infringing Products, infringe and continue to

12 infringe, whether directly, indirectly, literally, or by equivalency, one of more of the

13 claims of the '282 Patent, in violation of 35 U.S.C. § 271.

14     41.    Dahl has complied with 35 U.S.C. § 287, and has placed notice of the

15 '282 Patent on all products covered by the '282 Patent.  Dahl seeks enhanced

16 damages, costs, and attorney fees by reason of Defendants' conduct.

17     42.    Upon information and belief, Defendants acts of infringement as set

18 forth above are deliberate and willful, thus rendering this case "exceptional" under 35

19 U.S.C. § 285.

20     43.    As a consequence of the Defendants' infringing actions regarding the

21 '282 Patent, Dahl has suffered monetary damages in an amount not yet determined,

22 and Dahl will continue to suffer irreparable harm and monetary damages in the future

23 unless and until Defendants' infringing activities are enjoined by this Court.

24     44.    As a proximate result of Defendants' infringement of the '282 Patent,

25 Dahl has been, and will continue to be, injured in his business and property rights,

26 and is entitled to recover damages for such injuries pursuant to 35 U.S.C. § 284 in an

27 amount to be determined at trial.

28

- 8 -

**COMPLAINT**

1

## COUNT III

2

*(Trademark Infringement Under the Lanham Act - 15 U.S.C. § 1114)*

3    45.    Dahl realleges and incorporates by reference paragraphs 1 through 44 of
4  this Complaint as if set forth fully herein.

5    46.    For more than eleven (11) years, Dahl has been continuously using
6  Dahl's Mark, the federally registered Multi-Cart® mark, in connection with the Cart.
7  During this period, Dahl's Mark and reputation have continuously grown throughout
8  the music industry and are now well known throughout the United States as
9  indicating the source of Dahl's goods.

10    47.    Over the years, Dahl has spent a considerable amount of money
11  advertising and promoting Dahl's Mark in an effort to establish the mark in the minds
12  of customers as a source of high quality services.

13    48.    On information and belief, Defendants recently began using the mark
14  "Ulti-Cart" to identify Defendants' Infringing Products without a written consent, an
15  oral consent or a license from the Dahl.

16    49.    Defendants' use of a nearly identical mark is likely to cause confusion,
17  or to cause mistake, or to deceive as to the affiliation, connection, or association of
18  Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of
19  Defendants' goods by Plaintiffs.  Defendants' uses will further harm Dahl by causing
20  Dahl's Mark to suffer from dilution, either by tarnishment or blurring, and possibly
21  genericness.

22    50.    Defendants' acts constitute trademark infringement under the Lanham
23  Act, 15 U.S.C. § 1114.

24    51.    Defendants have engaged in and continue to engage in these activities
25  knowingly and willfully, without Dahl's authorization or consent, so as to justify the
26  assessment of treble damages and attorney's fees under 15 U.S.C. § 1117.

27    52.    Defendants' unlawful actions have caused and are continuing to cause
28  actual damages to Dahl in an amount which is to be determined at trial.

- 9 -

## COMPLAINT

1   53.   Defendants' conduct is causing immediate and irreparable injury and,

2   unless enjoined by this Court, will continue to cause Dahl to sustain irreparable

3   damage, loss and injury, for which Dahl has no adequate remedy at law.

## COUNT IV

*(Unfair Competition Under the Lanham Act - 15 U.S.C. § 1125(a))*

6   54.   Dahl realleges and incorporates by reference paragraphs 1 through 53 of

7   this Complaint as if set forth fully herein.

8   55.   Defendants are advertising and offering for sale Defendants' Infringing

9   Products which infringe the Patents-in-Suit and Dahl's Mark.  Defendants' advertising

10  efforts include, but are not limited to, various websites, such as

11  http://www.ultimatesupport.com/, as well as various product catalogs and flyers

12  distributed at industry trade shows, including the 2010 NAMM Show.

13  56.   Defendants' advertisements are directed toward and available to the

14  public in California, including within this District, as well as throughout the world.

15  See, e.g., Exhibits E & F.

16  57.   On information and belief, Defendants have engaged in the advertising

17  herein with the intent to mislead the public as to origin and ownership of rights in

18  Dahl's Mark.  In doing so, Defendants intended to sell Defendants' Infringing Products

19  and to mislead the public into believing that its products are the same as Dahl's or

20  otherwise authorize by or related to Dahl.

21  58.   Defendants' advertising was, and continues to be, untrue and misleading

22  and likely to deceive the public in that it appears therefrom that Defendants are the

23  originator, designer, or are otherwise authorized to manufacture and distribute

24  Defendants' Infringing Products (i.e., the"Ulti-Cart" carts, which name and cart design

25  appear nearly identical to the Cart and Dahl's Mark), and further, that Defendants own

26  the intellectual property underlying Defendants' Infringing Products and/or have the

27  manufacturing rights to the patent and trademark-protected Cart, all of which are

28  untrue.

- 10 -

**COMPLAINT**

1    59.   Defendants' unlawful and improper actions in connection with

2  Defendants' Infringing Products, as set forth above, are likely to cause confusion,

3  mistake or deception as to the source, origin or sponsorship of Defendants' Infringing

4  Products, and to falsely mislead the public and trade into believing that Defendants'

5  Infringing Products originate from, are affiliated or connected with, or are licensed,

6  sponsored, authorized, approved or sanctioned by, Dahl, all to the detriment and

7  damage of Dahl's reputation, goodwill and sales.

8    60.   Defendants' actions constitute false designation of origin and unfair

9  competition in commerce, in violation of the Lanham Act, 15 U.S.C. § 1125 (a).

10    61.   Defendants have engaged in and continue to engage in these activities

11  knowingly and willfully, without Dahl's authorization or consent, so as to justify the

12  assessment of treble damages and attorney's fees under 15 U.S.C. § 1117.

13    62.   Defendants' unlawful actions have caused and are continuing to cause

14  actual damages to Dahl in an amount which is to be determined at trial.

15    63.   Defendants' conduct is causing immediate and irreparable injury and,

16  unless enjoined by this Court, will continue to cause Dahl to sustain irreparable

17  damage, loss and injury, for which Dahl has no adequate remedy at law.

18                              **COUNT V**

19                *(Dilution of a Famous Mark- 15 U.S.C. § 1125)*

20    64.   Dahl realleges and incorporates by reference paragraphs 1 through 63 of

21  this Complaint as if set forth fully herein.

22    65.   Through Dahl's extensive efforts, Dahl's Mark has become distinctive,

23  well known and famous in the relevant industry.

24    66.   Defendants' use of a confusingly similar mark dilutes the distinctive

25  quality of Dahl's Mark.

26    67.   On information and belief, Defendants willfully intended to trade on the

27  Dahl's reputation or to cause dilution of the famous mark.

28

- 11 -

**COMPLAINT**

1       68.     As such, pursuant to 15 U.S.C. § 1116, Dahl is entitled to an injunction

2 against Defendants' use in commerce of a mark or trade name

3       69.     Dahl is also entitled to the remedies set forth in 15 U.S.C. §§ 1117(a) &

4 1118.

<center>COUNT VI</center>

6 *(Untrue and/or Misleading Advertising - Cal. Bus. & Prof. Code §§ 17500 & 17505)*

7       70.     Dahl realleges and incorporates by reference paragraphs 1 through 69 of

8 this Complaint as if set forth fully herein.

9       71.     In doing the acts herein alleged, Defendants have violated Cal. Bus. &

10 Prof. Code §§ 17500 and 17505 by falsely claiming that Defendants are the

11 originator, producer, manufacturer, processor, wholesaler, or importer, or that

12 Defendants own or control the intellectual property, factory, or other source of supply

13 of the Cart and Dahl's Mark.

14       72.     On information and belief, Dahl has suffered injury in fact and has lost

15 sales and money as a result of the violations alleged above in this Complaint, in that

16 Dahl's potential clients have been contacting Defendants to purchase Defendants'

17 Infringing Product.  Further, Dahl has been damaged in that through the false

18 designation of origin, Dahl's intellectual property, including Dahl's Mark and the

19 Patents-in-Suit, is being inaccurately associated with Defendants.

20       73.     Defendants' unlawful actions have caused and are continuing to cause

21 actual damages to Dahl in an amount to be determined at trial.

22       74.     Defendants' conduct is causing immediate and irreparable injury and,

23 unless enjoined by this Court, will continue to cause Dahl to sustain irreparable

24 damage, loss and injury, for which Dahl has  no adequate remedy at law.

<center>COUNT VII</center>

26 *(Statutory Unfair Competition – Cal. Bus. & Prof. Code § 17200, et seq.)*

27       75.     Dahl realleges and incorporates by reference paragraphs 1 through 74 of

28 this Complaint as if set forth fully herein.

<center>- 12 -</center>

<center>**COMPLAINT**</center>

1      76.    Defendants and each of their acts, as recited herein, constitute unlawful,

2 unfair or fraudulent business acts or practices in violation of the statutory laws of the

3 State of California, namely, the Unfair Business Practices Act, Cal. Bus. & Prof.

4 Code, § 17200, *et seq*.

5      77.    Defendants' unlawful actions have caused and are continuing to cause

6 actual damages to Dahl in an amount to be determined at trial.

7      78.    As a direct and proximate result of Defendants' willful and intentional

8 actions, Dahl has and will continue to suffer irreparable damage, justifying injunctive

9 and equitable relief.

10      79.    Dahl is informed and believes and based thereon alleges that

11 Defendants' acts were malicious, fraudulent and oppressive, justifying an award of

12 punitive damages in an amount according to proof such that Defendants and each of

13 them will not engage in such conduct in the future and make an example of them.

14 <div align="center">**COUNT VIII**</div>

15 <div align="center">*(Common Law Unfair Competition)*</div>

16      80.    Dahl realleges and incorporates by reference paragraphs 1-79 of this

17 Complaint as though set forth fully herein.

18      81.    Defendants and each of their acts, as recited herein, constitute unlawful,

19 unfair or fraudulent business acts or practices in violation of the common law of the

20 State of California.

21      82.    Defendants' unlawful actions have caused and are continuing to cause

22 actual damages to Dahl in an amount to be determined at trial.

23      83.    As a direct and proximate result of Defendants' willful and intentional

24 actions, Dahl has and will continue to suffer irreparable damage, justifying injunctive

25 and equitable relief.

26      84.    Dahl is informed and believes and based thereon allege that Defendants'

27 acts were malicious, fraudulent and oppressive, justifying an award of punitive

28 damages in an amount according to proof such that Defendants and each of them will

<div align="center">**COMPLAINT**</div>

1 | not engage in such conduct in the future and make an example of them.

2 | **<u>COUNT IX</u>**

3 | *(Breach of Contract)*

4 | 85.    Dahl realleges and incorporates by reference paragraphs 1-84 of this

5 | Complaint as though set forth fully herein.

6 | 86.    Plaintiff Dahl and Defendant Belitz agreed to the terms of a written

7 | confidentiality and non-disclosure agreement, the Belitz NDA, in July 2008.

8 | 87.    Under the terms of the Belitz NDA, Belitz was obligated not to disclose

9 | or otherwise use certain proprietary and confidential information disclosed by Dahl to

10 | Belitz during the consultancy.

11 | 88.    Plaintiff Dahl and Defendant Slaton agreed to the terms of a confidential

12 | and non-disclosure agreement, the Slaton NDA, in November 2001.

13 | 89.    Under the terms of the Slaton NDA, Slaton was obligated not to disclose

14 | or otherwise use certain proprietary and confidential information disclosed by Dahl to

15 | Slaton during the consultancy.

16 | 90.    Dahl performed all of the conditions, covenants and promises required

17 | of him under the terms and conditions of both the Belitz NDA and the Slaton NDA.

18 | 91.    Defendant Belitz breached the Belitz NDA contract with Dahl by

19 | disclosing or otherwise improperly using Dahl's confidential information to Dahl's

20 | detriment in violation of the Belitz NDA.

21 | 92.    Defendant Slaton breached the Slaton NDA contract with Dahl by

22 | disclosing or otherwise improperly using Dahl's confidential information to Dahl's

23 | detriment in violation of the Slaton NDA.

24 | 93.    As a result of their breaches of their respective agreements, Defendants

25 | Slaton and Belitz, and each of them, have caused Dahl to be damaged in an amount to

26 | be determined at trial, together with interest at the contract or statutory rate and all

27 | attorney fees and costs incurred in seeking enforcement.

28 |

- 14 -

**COMPLAINT**

1

## COUNT X

2

### (Promissory Estoppel)

3        94.    Dahl realleges and incorporates by reference paragraphs 1-93 of this

4    Complaint as though set forth fully herein.

5        95.    The Slaton NDA and the Belitz NDA represented clear and

6    unambiguous promises by Defendants not to misuse any confidential and proprietary

7    information which Dahl disclosed during their respective meetings.

8        96.    Dahl reasonably relied on such clear and unambiguous promises to his

9    detriment.  Defendants are now in fact misusing Dahl's confidential and proprietary

10   information to Dahl's detriment.

11       97.    Dahl's reliance was foreseeable to Defendants, since the parties had

12   written NDA agreements clarifying the scope of disclosures.  Dahl's reliance on

13   Defendants' promises was reasonable as well, given that Defendants executed signed

14   confidentiality and non-disclosure agreements attesting to the fact that they would not

15   misuse such disclosed information.

16       98.    As a result of Defendants' tortious acts, Dahl has suffered substantial

17   detriment and injury after reasonably relying on Defendants' promises of

18   confidentiality in an amount according to proof at trial, together with interest at the

19   contract or statutory rate and all attorney fees and costs incurred in seeking

20   enforcement.

21

## COUNT XI

22

### (Fraudulent Inducement)

23       99.    Dahl realleges and incorporates by reference paragraphs 1-98 of this

24   Complaint as though set forth fully herein.

25       100.   Dahl is informed and believes and based thereon alleges that Defendants

26   wrongfully, and fraudulently avoided their duties and obligations owing under the

27   Slaton NDA and Belitz NDA in order to acquire Dahl's confidential and proprietary

28   information.

- 15 -

**COMPLAINT**

101.   Dahl is informed and believes and based thereon alleges that as an actual and proximate result of Defendants' fraudulent conduct, Dahl has suffered resulting damage and harm according to proof, together with interest at the contract or statutory rate and all attorney fees and costs incurred in seeking enforcement.

102.   Dahl is informed and believes and based thereon alleges that Defendants intentionally, willfully, fraudulently, and maliciously did the things herein alleged in furtherance of its conspiracy.  Dahl is therefore entitled to an exemplary award of punitive damages such that Defendants and each of them will not engage in such conduct in the future and make an example of them.

## COUNT XII

*(Civil Conspiracy to Commit Fraud & Misappropriate Confidential Information)*

103.   Dahl realleges and incorporates by reference paragraphs 1-102 of this Complaint as though set forth fully herein.

104.   Dahl is informed and believes and based thereon alleges that Defendants formed and operated a conspiracy to wrongfully, and fraudulently avoid their duties and obligations owing under the Slaton NDA and Belitz NDA in order to acquire Dahl's confidential and proprietary information.

105.   Dahl is informed and believes and based thereon alleges that as an actual and proximate result of Defendants' conspiracy, Dahl has suffered resulting damage and harm according to proof.

106.   Dahl is informed and believes and based thereon alleges that Defendants, and each of them, intentionally, willfully, fraudulently, and maliciously did the things herein alleged in furtherance of its conspiracy.  Each of the Defendants acted together and committed one or more acts in furtherance of tortious conduct. Dahl is therefore entitled to an exemplary award of punitive damages such that Defendants and each of them will not engage in such conduct in the future and make an example of them.

- 16 -

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT XIII

*(Misappropriation of Trade Secrets –*

*California's Uniform Trade Secrets Act, Civil Code §§ 3426–3426.11)*

107.   Dahl realleges and incorporates by reference paragraphs 1-106 of this Complaint as though set forth fully herein.

108.   Defendants acquired Dahl's confidential and proprietary information through an improper means, either by way of theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

109.   Defendants' acts amount to a misappropriation of Dahl's confidential and proprietary information, in that Defendants acquired by improper means, and/or at the time of disclosure or use of such information, knew or had reason to know that their knowledge of such information was either derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

110.   Dahl requests that Defendants be enjoined from profiting on their misappropriation by instituting an injunction, which should be continued for an adequate period of time in order to eliminate the wrongful commercial advantage Defendants acquired from the misappropriation.

111.   Dahl is informed and believes and based thereon alleges that as an actual and proximate result of Defendants' misappropriation, Dahl has suffered resulting damage and harm according to proof.

112.   Dahl is informed and believes and based thereon alleges that Defendants intentionally, willfully, fraudulently, and maliciously did the things herein alleged in furtherance of its conspiracy. Each of the Defendants acted together and committed one or more acts in furtherance of tortious conduct. Pursuant to Civ. C. § 3426.3,

- 17 -

**COMPLAINT**

Dahl is therefore entitled to an exemplary award of punitive damages such that Defendants and each of them will not engage in such conduct in the future and make an example of them.

113.   Dahl is informed and believes and based thereon alleges that Defendants misappropriation was willful and malicious such that the court should award him reasonable attorney's fees.

## REQUEST FOR PRELIMINARY INJUNCTION

114.   Dahl realleges and incorporates by reference paragraphs 1-113 of this Complaint as though set forth fully herein.

115.   Dahl seeks to enjoin each of Defendants and their respective agents and representatives from making, using, selling, offering for sale, and/or importing Defendants Infringing Products during this suit, because this activity infringes Dahl's rights in the Patents-in-Suit and in Dahl's Mark.

116.   Dahl also seeks to enjoin each of Defendants and their respective agents and representatives from making, using, selling, offering for sale, and/or importing goods which make use of Dahl's Mark or confusingly similar variations thereof, including but not limited to "Ulti-Cart." Dahl will suffer irreparable injury if the court does not enjoin Defendants from using confusingly similar and nearly identical marks to Dahl's registered mark, because Dahl's Mark will suffer from dilution, tarnishment, blurring, and/or generic use.

117.   There is a substantial likelihood that Dahl will prevail on the merits. The evidence in Dahl's possession indicates Defendants Infringing Products infringe one or more of the claims of the Patents-in-Suit.

118.   If this Court does not grant a preliminary injunction, Defendants will continue their infringing activities that infringe Dahl's patent and trademark rights. Defendants will continue to receive ill-gotten gains and harm Dahl.

119.   Moreover, Defendants' false and misleading advertising efforts continue to damage Dahl's reputation and goodwill associated with Dahl's goods.

- 18 -

**COMPLAINT**

1    120.   As such, Dahl will suffer irreparable injury if the court does not enjoin
2  Defendants from continuing.

3    121.   Defendants will not suffer undue hardship or loss as a result of the
4  issuance of a preliminary injunction because they do not have a superior right to
5  make, use, sell, offer for sale, or import products covered by the Patents-in-Suit
6  and/or Dahl's Mark.

7    122.   Issuance of a preliminary injunction would not adversely affect the
8  public interest.  On the contrary, the public will benefit by the issuance of such an
9  injunction, since it will allow the public to purchase products authorized under the
10  Patents-in-Suit and/or Dahl's Mark.

11    123.   Dahl asks this Court to set this request for preliminary injunction for
12  hearing at the earliest possible time and, after hearing the request, to issue a
13  preliminary injunction against each of the Defendants, their respective agents, and
14  representatives

15

16                              **JURY DEMAND**

17          Dahl hereby demands a trial by jury on all issues that may be heard by a jury.

18

19                            **PRAYER FOR RELIEF**

20          WHEREFORE, Plaintiff Dahl requests that this Court enter judgment in their
21  favor and against Defendants, and each of them, that:

22    a.  Defendants have engaged and are engaging in infringement of the Patents-in-
23  Suit;

24    b.  Defendants' infringement of the Patents-in-Suit has been and is willful;

25    c.  Defendants be preliminarily and permanently enjoined, along with their
26  officers, directors, agents, employees, attorneys, parents, subsidiaries, and all others
27  acting by or through Defendants, and each of them, or controlled by Defendants, or
28

- 19 -

**COMPLAINT**

1 | acting in concert or participating with Defendants, from further infringing the
2 | Patents-in-Suit;

3 |     d.  Defendants have engaged and are engaging in infringement of Dahl's Mark;

4 |     e.  Defendants' infringement of Dahl's Mark has been and is willful;

5 |     f.  Defendants be preliminarily and permanently enjoined, along with their
6 | officers, directors, agents, employees, attorneys, parents, subsidiaries, and all others
7 | acting by or through Defendants, and each of them, or controlled by Defendants, or
8 | acting in concert or participating with Defendants, from further infringing Dahl's
9 | Mark;

10 |     g.  Defendants be enjoined from importing any collapsible carts into the United
11 | States which violate Dahl's rights in the Patents-in-Suit or Dahl's Mark;

12 |     h.  Defendants have engaged and are engaging in acts amounting to unfair
13 | competition under the laws of the State of California;

14 |     i.  Dahl be awarded damages in an amount to be proven at trial for unfair and
15 | illegal business practices under California's statutory and common laws;

16 |     j.  Defendant Slaton has engaged and is engaging in acts amounting to a breach of
17 | the contractual arrangement entered into between himself and Plaintiff Dahl;

18 |     k.  Defendant Belitz has engaged and is engaging in acts amounting to a breach of
19 | the contractual arrangement entered into between himself and Plaintiff Dahl;

20 |     l.  Defendant Slaton be estopped from denying he owed Dahl any duty to
21 | maintain certain information as confidential as a result of Dahl's reasonable reliance
22 | on Slaton's promises;

23 |     m. Defendant Belitz be estopped from denying he owed Dahl any duty to maintain
24 | certain information as confidential as a result of Dahl's reasonable reliance on
25 | Slaton's promises;

26 |     n.  Defendants have engaged in acts amounting to fraudulent inducement resulting
27 | in harm to Dahl;

28 |

- 20 -

**COMPLAINT**

1    o.  Defendants have engaged and are engaging in acts amounting to a civil
2  conspiracy to commit fraud and misappropriate confidential information resulting in
3  harm to Dahl;

4    p.  Defendants account to Dahl for damages adequate to compensate for
5  Defendants' infringement of the Patents-in-Suit and that such damages be awarded to
6  Dahl, including prejudgment and postjudgment interest, including all amounts
7  pursuant to 35 U.S.C. §§ 284 & 285;

8    q.  Dahl be awarded recovery for Defendants' profits and all damages sustained
9  by Plaintiffs under 15 U.S.C. § 1117(a) and this case be deemed an exceptional case
10  under applicable law, and that Dahl be awarded his reasonable attorney fees and
11  disbursements in this action and treble damages;

12    r.  Defendants' Infringing Products be seized;

13    s.  Defendants be ordered, in accordance with 15 U.S.C. § 1118, to deliver to
14  Dahl for destruction all of Defendants' Infringing Products and packaging in their
15  possession or under their control;

16    t.  Defendants be ordered, in accordance with 15 U.S.C. § 1116, to file a verified
17  report with this Court within thirty (30) days of the Court's entry of injunctive relief,
18  specifying in detail the manner and form in which Defendants have complied with
19  any injunction and order of this Court;

20    u.  Defendants committed acts amounting to trade secret misappropriation in
21  violation of California's Uniform Trade Secrets Act, Civil Code §§ 3426–3426.11;

22    v.  Defendants be enjoined by way of injunction from further profiting from their
23  misappropriation of Dahl's confidential and proprietary information, pursuant to
24  Civil Code § 3426.2;

25    w. Dahl be awarded all available damages and attorney fees pursuant to Civil
26  Code §§ 3426.3 & 3426.4;

27    x.  For costs of suit, including reasonable attorneys fees;

28

- 21 -

**COMPLAINT**

1       y.  Defendants' tortious acts were malicious, fraudulent and oppressive, justifying

2    an award of punitive damages in an amount such that Defendants and each of them

3    will not engage in such conduct in the future and make an example of them; and

4       z.  Such other and further relief as the Court deems just and proper.

5

6                                           Respectfully Submitted,

7    Dated:  January 25, 2010              BUCHE & ASSOCIATES, P.C.

8

9

10                                     JOHN KARL BUCHE (SBN 239477)

11                                     SEAN M.  SULLIVAN (SBN 254372)

12                                    Tel: 858.459.9111

13                                    Fax: 858.459.9120

14                                    Attorneys for Plaintiff,

15                                    GARY-MICHAEL DAHL

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 -

**COMPLAINT**

EXHIBIT A



US005476282A

# United States Patent [19]

## Dahl

| [11] | Patent Number: | **5,476,282** |
|---|---|---|
| [45] | Date of Patent: | **Dec. 19, 1995** |

[54] **CONVERTIBLE TRANSPORT CART**

[76] Inventor: **Gary-Michael Dahl**, 8300 Sands Point Dr. #903, Houston, Tex. 77036

[21] Appl. No.: **94,605**

[22] Filed: **Jul. 19, 1993**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 762,568, Sep. 17, 1991, Pat. No. 5,228,716.

[51] **Int. Cl.⁶** ...................................................... **B62B 3/02**
[52] **U.S. Cl.** .................. **280/651**; 280/47.18; 280/47.29; 280/47.34
[58] **Field of Search** .......................... 280/651, 35, 47.18, 280/47.27, 47.28, 47.29, 655, 655.1, 638, 47.34, 47.2

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 1,662,730 | 3/1928 | Wertenberger . | |
|---|---|---|---|
| 2,263,879 | 11/1941 | Jorgensen | 280/5.24 |
| 2,519,113 | 8/1950 | Cohn | 280/49 |
| 2,620,041 | 12/1952 | Chenette | 180/9.1 |
| 2,820,643 | 1/1958 | Cohn | 280/34 |
| 3,104,890 | 8/1963 | Hill | 280/34 |
| 3,206,790 | 9/1965 | Romay | 16/35 |
| 3,423,103 | 1/1969 | Maltarp | 280/655.1 |
| 3,759,538 | 9/1973 | Fabiano | 280/47.35 |

| 3,761,107 | 9/1973 | Doeherty | 280/348 |
|---|---|---|---|
| 3,837,667 | 9/1974 | Sernovitz | 280/47.34 |
| 4,009,891 | 3/1977 | Jensen | 280/657 |
| 4,448,440 | 5/1984 | Gier | 280/655 |
| 4,637,626 | 1/1987 | Foss | 280/655 |
| 4,717,168 | 1/1988 | Moon, Sr. | 280/641 |
| 4,796,909 | 1/1989 | Kirkendall | 280/651 |
| 4,830,385 | 5/1989 | Wallick et al. | 280/35 |
| 4,902,027 | 2/1990 | Skelly | 280/33.998 |
| 5,070,725 | 2/1992 | Feldner | 280/651 |
| 5,228,716 | 7/1993 | Dahl | 280/651 |

*Primary Examiner*—Margaret A. Focarino
*Assistant Examiner*—Michael Mar
*Attorney, Agent, or Firm*—Harrison & Egbert

[57] **ABSTRACT**

A convertible cart for transporting objects having a frame, a first handle connected to the frame, a second handle connected adjacent an opposite end of the frame, a plurality of wheels attached to the frame. Each of the handles is selectively movable between a first position generally perpendicular to the frame and a second position generally aligned with the frame. The wheels support the frame at a position parallel to the surface on which the wheels are placed. The frame has a longitudinal member extending centrally of the frame. The longitudinal member has an end offset from overlapping relationship with one end of the frame. A snap button is provided within the longitudinal member so as to limit telescoping movement of one portion of the longitudinal member with respect to another portion.

**6 Claims, 4 Drawing Sheets**



**U.S. Patent**    Dec. 19, 1995    Sheet 1 of 4    5,476,282



FIG. 1

FIG. 2

FIG. 3



*FIG. 4*



FIG. 5



FIG. 6

**U.S. Patent**          Dec. 19, 1995          Sheet 4 of 4          5,476,282



FIG. 7



FIG. 8

EXHIBIT A                    Page 5 of 11

5,476,282

**1**

# CONVERTIBLE TRANSPORT CART

### RELATED APPLICATIONS

The present application is a continuation-in-part of U.S. patent application Ser. No. 07/762,568, filed on Sep. 17, 1991, and entitled "Convertible Transport Cart", now U.S. Pat. No. 5,228,716.

### TECHNICAL FIELD

The present invention relates to hand trucks, dollies, and other land vehicles. More particularly, the present invention relates to lightweight, telescoping foldable and convertible hand trucks and/or platform carts which are used for transporting objects.

### BACKGROUND ART

Many improvements have been made in the area of hand trucks and dollies for material handling. However, none of these improvements have efficiently and effectively addressed the needs of professional musicians. Professional musicians are required to transport wide varieties of musical instruments and related gear often utilizing small cars and trucks over various terrains and changing environments while travelling to and from performance sites. Due to the virtual explosion in technology over the last ten years regarding P.A. systems, electronic keyboards, effects and the like, musical groups require more equipment than ever before. The problems of transporting the above-mentioned equipment have become increasingly difficult. It is desirable to create a specialized dolly or cart that can satisfy the criteria of musicians.

In the past few years, mini-vans and small trucks have been placed in common use for the transport of musical and other equipment. As such, space limitations have become of great concern to musicians. Any transport cart must now have a size which can carry large loads yet collapse to a small storage size so as to leave maximum room for equipment with the mini-van. Space is at a premium within a mini-van or a small truck.

Initially, it is desirable to produce a lightweight cart weighing under thirty-five pounds. It has been found that professional musicians experience finger stiffening and muscle stiffening in the hands and forearms when lifting objects over forty pounds which is deleterious to musical performance. In addition, the carrying of heavy equipment can contribute to back problems and related physical impairment. In addition, it also tights laryngeal muscles and, thus, hampers singing performance.

When transporting musical equipment, any cart or dolly should be capable of supporting at least five hundred pounds or more. Musical equipment is delicate and should be transported smoothly and without shock. In addition, the musical equipment should be properly supported and handled with care. Any handtruck or dolly must be able to reduce to a size of three feet of length or less with one side flat so as to facilitate receipt in small cars or trucks and/or baggage handling in airports.

In order to effectively accommodate keyboards and large P.A. cabinets, a cart must have the ability to extend to approximately fifty-four inches. It should also be short enough to maneuver through labrinyth-like corridors and elevators, often found in hotels and stage areas. Support should be provided on each end of the cart so as to maintain the expensive and delicate equipment within the confines of

**2**

the frame of the dolly. Tall foldable sides can be useful for securing equipment such as drums, guitars, horns and the like, as well as acting as a hanger for various stage clothes. Also, the cart should be able to act as a "platform cart" so that the bed of the cart is flat with one side upright so as to accommodate long 24-channel mixing consoles or lighting trusses that would overhang the ends of the cart.

Since the equipment must be transported over various terrains, the cart should have the quality suitable for rolling smoothly and shock-free over such various terrains. The wheeled mechanism of the dolly or cart should be suitable for traversing curbs, stairs, grass, dirt and rough pavement. The cart should provide a broad frame surface so as to easily receive the musical equipment. A non-skid surface is useful in order to prevent odd-shaped instruments and widely-used polyethylene cases (which are notoriously slippery) from slipping and falling off during transport. The cart should be able to be converted from a two-wheel hand truck to a four-wheel cart or any other configuration both extremely quickly and efficiently. Since the cart must be loaded and unloaded often between musical performances, complete assembly into any loading configuration should be completed within ten seconds.

It is often the requirement of musicians that they must set up extremely quickly and must break down the equipment quickly. As such, it is a requirement for a musical instrument transport cart that the cart be able to be assembled into its proper position for receiving equipment very quickly and easily. Undue manipulation of screws, nuts, bolts, and other items wastes a great deal of time and is generally unsuitable for the purposes of the musician. A musical instrument transport cart must be capable of rapid assembly. The cart should also be capable of assuming any configurations within ten seconds or less. The cart should also be able to carry small objects on the frame without falling through.

A caster brake is necessary so as to allow the cart to be retained on uneven surfaces.

It is also important for musical equipment to be maintained on a surface parallel to the surface on which the cart is travelling. As such, the frame of the cart should be supported on wheels which maintain the frame in parallel relationship to the earth. Any angling of the frame will tend to cause the equipment to move to the lowest end of the cart. The angling may also cause excessive and unexpected pressures to be applied to cart components. In order to enhance the ability to maintain the parallelism of the cart to the surface, the handle should be foldable in such a way so as to maintain this parallelism.

Various patents have issued in the past which deal with various types of collapsible hand trucks and dollies. U.S. Pat. No. 1,662,730, issued on Mar. 13, 1928, to Wertenberger et al. shows a stylized truck having a broad surface with suitable caster wheels for transporting bathtubs. U.S. Pat. No. 2,519,113, issued on Aug. 15, 1950, to L. I. Cohn shows a hand truck having a collapsible handle at one end, a stair climbing apparatus, and an adjustable frame. U.S. Pat. No. 2,620,041, issued on Dec. 2, 1952, to Chenette et al. shows a truck having a treaded stair climbing attachment. U.S. Pat. No. 2,820,643, issued on Jan. 21, 1958, to L. I. Cohn shows a hand truck and dolly having an adjustable handle for converting the truck into a dolly. U.S. Pat. No. 3,104,890, issued on Sep. 24, 1963, to N. Hill shows a utility cart having telescoping tubular frame members. U.S. Pat. No. 3,206,790, issued on Sep. 21, 1965, to C. Romay describes a locking assembly for a swiveled caster as used on trucks and other carts. U.S. Pat. No. 3,759,538, issued on

5,476,282

**3**

Sep. 18, 1973, to A. J. Fabiano illustrates a mobile storage facility having wheels and handles for supporting a tray for garden implements, accessories, and supplies. U.S. Pat. No. 3,761,107, issued on Sep. 25, 1973, to Dochery et al. shows an adjustable dolly for supporting furniture thereon. U.S. Pat. No. 3,837,667, issued on Sep. 24, 1974, to M. A. Sernovitz shows an open-framed cart for receiving containers stacked in a nested relationship. U.S. Pat. No. 4,009,891, issued on Mar. 1, 1977, to O. Jensen provides a hand truck and dolly with an adjustable frame and support chassis. U.S. Pat. No. 4,448,440, issued on May 15, 1984, to R. H. Gier discloses a hand truck having a load supporting platform pivotted to swing from an operative position to a position flush against the frame. U.S. Pat. No. 4,637,626, issued on Jan. 20, 1987, to Foss et al. shows a portable, foldable and convertible luggage trolley. U.S. Pat. No. 4,717,168, issued on Jan. 5, 1988, to J. R. Moon discloses a utility cart having a pair of balloon tire wheels supporting a frame counterbalanced for easy pushing. A pair of caster wheels are provided on the front of the inclined frame. U.S. Pat. No. 4,796,909, issued on Jan. 10, 1989, to V. S. Kirkendall describes a four wheeled pull-type service cart designed to transport heavy loads over sandy terrain. European Patent No. 294,249 shows a dolly having a detachable tubular structure which provides an extendible platform.

U.S. Pat. No. 5,228,716, issued on Jul. 20, 1993, to the present inventor teaches a convertible transport cart. After experimentation with the transport cart of this U.S. patent, it was found that several improvements were possible. First, it was found that the rectangular frame, although strong, lacked a certain degree of structural integrity. Additionally, it was found that the rectangular frame of this patent inhibited the ability to transport certain small articles (i.e., those articles that had a length less than the width between the bars of the frame). Often, musicians would complain that certain small objects could not be conveniently transported by the cart because of the wide spacing between the sides of the frame. Another problem which was noted was when the cart was configured in its "hand truck" position, there were occasions where the telescoping U-shaped members would slide from one another, especially if the thumbnuts were not sufficiently tightened. The lack of a safeguard mechanism to prevent the members from telescoping apart was a concern to certain users of the cart.

It is an object of the present invention to provide a convertible cart designed to be use in combination with the transport of musical equipment.

It is an object to provide a cart that will carry up to five hundred pounds, will extend to fifty-two inches in length, weigh less than thirty-five pounds, and collapse to thirty-six inches in length for storage, be durable, and be relatively inexpensive.

It is another object of the present invention to provide a telescoping and collapsible cart for easy storage.

It is another object of the present invention to provide foldable handles having a sufficient height to allow for efficient stacking and carrying of delicate musical equipment as well as for allowing for easy storage.

It is another object of the present invention to provide a cart that is long enough so that the handle folds flat within the framework of the cart.

It is a further object of the present invention to provide a locking mechanism for the handles of a cart which allows the handles to be positioned up or down within one second each.

It is a further object of the present invention to provide a

**4**

cart having handles and a frame that can be arranged so as to maintain a parallel relationship with the earth.

It is still a further object of the present invention to provide a cart that can be easily transported through airports and the like by having a folded length of three feet or less and a flat side for airport transport belts.

It is another object to provide a cart that has minimal protrusions for the prevention of snagging, scraping, and injury.

It is another object to provide a cart that will carry smaller objects as well as larger objects without slipping through the frame.

It is another object of the present invention to provide a cart that limits the amount of telescoping movement and for preventing telescoping separation of the cart.

It is a further object of the present invention to provide a cart that is convertible between a platform cart, a piano dolly, a two-wheel or four-wheel hi-stacker, and a storage unit configuration.

These and other objects and advantages of the present invention will become apparent from a reading of the attached specification and appended claims.

SUMMARY OF THE INVENTION

The present invention is a convertible cart for transporting objects which comprises a frame, a first handle connected to the frame adjacent one end of the frame, a second handle connected to the opposite end of the frame from the first handle, a pair of primary wheels attached to one end of the frame, and at least one secondary wheel attached to the opposite end of the frame. Each of the first and second handles is selectively movable between a first position generally perpendicular to the frame and a second position aligned with the frame. The wheels support the frame in a position parallel to the surface on which the wheels are placed.

The frame comprises a first U-shaped member and a second U-shaped member slidably engaging the first U-shaped member. The first and second U-shaped members are movable relative to each other for changing a length of the frame. A locking member is fastened to one of the U-shaped members so as to selectively engage the other of the U-shaped members. Specifically, a thumbnut is threadedly fastened to one of the U-shaped members on an underside of the frame. This thumbnut is rotatable to a position in abutment with the other of the U-shaped members.

The frame has a longitudinal member extending centrally of the frame. This longitudinal member has an end which is offset from overlying relationship with one end of the frame. The longitudinal member has a first portion slidably receiving a second portion. The first portion is affixed to the first U-shaped member. The second portion is affixed to the second U-shaped member. The second portion is telescopically received within the first portion. The second portion has a snap button positioned within the first portion adjacent an end of the second portion. The first portion has an opening formed adjacent one end on a bottom surface. The second portion has a hole extending through a bottom adjacent the end of the second portion. The snap button has a head received within the hole of the second portion. The head of the snap button engages the opening of the first portion when the hole aligns with the opening. The longitudinal member has an end affixed to a bracket. This bracket

5,476,282

5

extends inwardly from the end of the frame. This arrangement allows the second handle to fold in coplanar alignment with the side of the sides of the frame frame.

The frame has a first stop member fastened to the frame adjacent to the first handle. The frame also has a second stop member fastened to the frame adjacent to the second handle. The first and second stop members are in abutment with the first and second handles when the handles are in the first position. The frame has a first axle member in engagement with the first handle. A second axle member is also connected to the frame for engagement with the second handle. The first handle is rotated between the first and second positions about this first axle member. The second handle is rotatable between the first and second positions about the second axle member. These axle members extend inwardly from the frame. Each of the axle members has a slide surface which allows the handle to slide longitudinally thereacross. Each of the first and second handles has a U-shaped configuration. A flexible cord extends between the ends of the handle so as to allow the handles to slide on the axle members.

The pair of primary wheels are pneumatic wheels. The secondary wheels are two pivoting caster wheels provided on opposite sides of one end of the frame. A lock is provided for selectively preventing rotation of the caster wheels.

A stair climber frame member is fastened to an underside of the frame adjacent to the primary wheels. This stair climber extends diagonally from the wheels to the frame.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the present invention illustrating the expanded operable position for use as a dolly.

FIG. 2 is a perspective view of the present invention illustrating the configuration of the present invention as a two wheeled hand truck.

FIG. 3 is a perspective view of the present invention showing the handles in their collapsed position.

FIG. 4 is an end view of the cart of the present invention showing, in particular, the configuration of the locking mechanism.

FIG. 5 is an end view similar to FIG. 4 showing, in particular, the workings of the locking mechanism.

FIG. 6 is a detailed view, in cross-section, of the locking mechanism of the present invention.

FIG. 7 is a cross-sectional view as taken of circled area "A" of FIG. 1.

FIG. 8 is a cross-sectional view as taken of circled area "B" of FIG. 2.

DETAILED DESCRIPTION OF THE INVENTION

With reference to the drawings, FIG. 1 illustrates the present invention in its fully extended position. The frame 11 of cart 10 is made of preferably a mild square tubular steel which is structurally light. The frame 11 is comprised of slidably cooperating U-shaped square tubing divided into two sections. The main frame bed 12 and the telescoping frame section 13 are provided so as to form the frame 11. Telescoping frame section 13 slidably engages the main frame 12. The frame 11 may be welded or bonded by mechanical means such as by bolts 14. The main frame bed 12 includes a non-skid surface 19 for reduced possibility of accidental slipping of equipment.

6

A stair climber attachment 15 is secured to the lower end of the main frame bed 12. The stair climber attachment 15 includes axle 16 for supporting two primary pneumatic wheels 17 and also serving as a lateral support bar 18 for bracing the main frame bed 12. Another lateral support bar 20 is placed where the telescoping frame section 13 and the main frame bed interconnect. This reinforces the mid-section of the frame 11. Additional reinforcement is provided by the use of heavy duty thumbnuts 21. The thumbnuts 21 are threadedly received on the underside of main frame bed 12 on each side of the frame bed. Thumbnuts 21 can be rotated so as to move in abutment with the telescoping frame section 13. This serves to lock the telescoping frame section 13 in position relative to the main frame bed 12. The thumbnuts 21 are located on the underside of the main frame bed 12 so as to avoid snagging of equipment or objects located on the top or sides of the cart 10.

A brace 22 extends down from and is attached to the front or top end of the telescoping frame section 13. Brace 22 is of a suitable size to serve as a support 23 for the secondary wheels 24. Secondary wheels 24 are preferably pivoting casters for ease in direction change. Brace 22, in combination with secondary wheels 24, allows for uniform balance of the front and back of cart 10.

Inverted U-shaped equipment support handles 25 and 25a are symmetrically placed on opposite ends of frame 11. The equipment support handles 25 and 25a are releasably attached to the frame by suitable hinges 26 for ease in collapsing equipment support handles 25 and 25a. The handles 25 and 25a are also locked into place by suitable mechanical means, to be described hereinafter in conjunction with FIGS. 4–6.

Each of the handles 25 and 25a is supported on axle members 27. Handles 25 and 25a can rotate about axles 27 from a first position to a second position. The first position of handles 25 and 25a is illustrated in FIG. 1. Handles 25 are in a position perpendicular to the frame 11 of cart 10. The second position of handles 25 and 25a is shown in FIG. 3 in which the handles 25 and 25a are rotated about axles 27 so as to assume a position parallel to and aligned with the frame 11. The ability to rotate the handles 25 and 25a about axles 27 enhances the capabilities of the present invention. A specialized mechanism is provided for locking the handles in proper position.

As can be seen in FIG. 1, there is at 29 a longitudinal member extending centrally of the frame 11. This longitudinal member 29 has one end 31 which overlies a top surface of an end portion 33 of frame 11. Another end 35 of longitudinal member 29 is offset from the overlying relationship with the end 37 of the frame 11. The area of this offset relationship is indicated by the circled area A and will be described hereinafter. As can be seen, the longitudinal member 29 includes a first portion 41 and a second portion 43. The first portion 41 slidably receives the second portion 43 therein. As a result, when it is necessary to extend the length of the frame 11, the portions 41 and 43 of the longitudinal member 29 can slide with the sliding of the remaining U-shaped portions of the frame. After experimentation, it was found that the addition of the longitudinal member 29 greatly improved the structural stability of the cart 10 beyond expectations. The addition of the longitudinal member 29 greatly enhances the capacity of the cart to carry heavy loads. Additionally, the longitudinal member 29 allows the frame 11 to retain objects thereon that have a length less than the width between the sides of the frame. As was stated previously, it had been a problem where small objects could fall between the sides of the frame 11. The

5,476,282

7

longitudinal member 29 now serves to retain objects that would otherwise fall between the sides of the frame. Importantly, the offset relationship between the end 35 of the longitudinal member 29 and the top surface of the end 37 of frame 11 allows the handle 25 to be properly lowered so as to be in coplanar relationship with the sides of the frame 11.

In FIG. 2, it can be seen that the handle 25a is rotated about axles 27 so as to be aligned with the frame 11. The handle 25a is contained within the perimeter formed by frame 11. The other handle 25 is placed in its first position perpendicular to the frame 11. In the position illustrated in FIG. 2, the cart 10 assumes a hand truck configuration.

FIG. 3 illustrates the cart 10 in its configuration as a four-wheel flatbed cart. In FIG. 3, the handles 25 and 25a are both rotated about axles 27 so as to be placed in their second position. The second position is a flat position on the frame 11. It can be seen that one handle 25 is received within the sides of frame 11 and is generally coplanar with the area of frame 11. The offset relationship between the end 35 of longitudinal member 29 and the end 37 of frame 11 permits handle 25 to be folded in this coplanar relationship with the sides of frame 11. The other handle 25a is hinged to axles 27 slightly above the top surface of frame 11. This causes the other handle 25a to assume a position juxtaposed against the top surface of frame 11 and arranged parallel to frame 11. In either of the configurations, the top surface of the cart 10 of the present invention will be flat and parallel to the surface upon which the cart 10 rests.

The stair climber attachment 15 supports the frame 11 a distance above pneumatic wheels 17. The stair climber attachment 15 extends generally diagonally from the wheels 17 to the frame 11. Similarly, the brace 22 and the support 23 supports the frame 11 a distance above the caster wheels 24. It is important to the embodiment of the present invention that the frame 11 be supported so as to be parallel above the surface upon which the cart 10 rests. As such, the structural members are configured so as to provide this levelling of the frame 11 above the wheels. The primary wheels 17 are positioned on opposite sides of frame 11. Similarly, the caster wheels 24 are placed on opposite sides of frame 11. The pneumatic wheels 17 allow the cart 10 to be moved along various types of terrain. The pneumatic wheels 17 allow the cart to be moved without shock to the contents on the frame 11. The wheels 17 can be inflated to any desired pressure.

The use of the mild durable square tubular steel material is, by structural design, light enough in weight to be manually lifted onto a truck or into an automobile trunk. It is also structurally sound enough to withstand and support as much as 500 pounds of equipment. The overall empty weight of the cart 10 should not exceed forty pounds. The square tubular steel is preferred because it allows for a larger surface area on the frame 11 than does rounded tubing. Non-skid adhesive tape, or the like, is applied to the top surface of the main frame bed 12 so as to reduce the possibility of equipment slipping from the cart.

The telescoping frame 11 allows for compact storage when the cart 10 is not in use. This is important given the limited space often available to musicians. The cart achieves maximum hauling capacity when the frame 11 is fully extended. The ends of the cart 10 are designed to be bilaterally symmetrical and are of sufficient height to allow for efficient stacking of musical equipment. The ends releasably collapse to the frame 11 for convenient storage. Foamed handles may be provided on the top of handles 25 for the comfort of the user.

8

The stair climbing device 15 is attached to the bottom of the cart 10 to aid in ascending and descending stairs. The primary wheels 17 are located at the bottom end of the cart and use part of the stair climbing device as an axle. These primary wheels are preferably pneumatic for a smooth ride on rough terrain. The secondary wheels 24 are located on the opposite end of the cart and are preferably pivoting caster wheels for ease and direction change and maneuverability.

The lateral support bars 18 and 20 are placed perpendicular in the frame to help support equipment and reinforce the structural stability of the frame 11. The frame 11 is actually made of two separate pieces, the main frame bed 12 and the telescoping frame bed 13. The attachment of telescoping frame section 13 to the main frame bed 12 is further enhanced by the use of the heavy-duty thumbnut which affixes the sections in position relative to each other. Additionally, as will be described hereinafter, a snap button is received within a portion of the telescoping longitudinal member 29. This snap button serves to limit and safeguard the relative movement of the telescoping sections of frame 11.

FIG. 4 shows an end view of the cart 10 of the present invention. FIG. 4 illustrates, in particular, the configuration of the locking mechanism 50 in accordance with the preferred embodiment of the present invention. As can be seen in FIG. 4, cart 10 includes inverted U-shaped handle 25 which is rotatably connected to axle members 54 and 56. The ends 58 of handle 25 rest in abutment against a first stop member 60 and a second stop member 62. The other side of the ends 58 of handle 25 are in abutment with crossbar 64. In this position, the handle 25 is supported in a rigid upright position. The ends 58 cannot move because of their abutment with stop members 60 and 62 and with crossbar 64. A cord 66 is fastened adjacent to the ends 58 of handle 25 and extends between the ends 58 in generally close proximity to the axle members 54 and 56 and near the stop members 60 and 62.

The first axle member 54 is rigidly affixed in position and extends inwardly from frame portion 68. Similarly, the second axle member 56 is rigidly supported by and extends inwardly from the frame portion 70. Frame portions 68 and 70 are supported by the stair climber attachment 72. Wheel axle 74 extends beneath the frame portions 68 and 70 and is received by the stair climber attachment 72. Wheel axle 74 rotatably supports the pneumatic wheels 76 and 78. Wheels 76 and 78 rest on surface 80. It can be seen that the frame of cart 10 resides parallel to the surface 80 when the cart is in the position illustrated in FIG. 4.

In FIG. 4, the longitudinal member 29 is shown as having end 31 affixed in overlying relationship with the crossbar 64. The longitudinal member 29 extends centrally of the frame.

FIG. 5 illustrates how the locking mechanism of the present invention actually operates so as to allow the handle 25 to move from its first perpendicular position to its position in alignment with the frame of cart 10. As can be seen in FIG. 5, a pressure is applied, either upwardly or downwardly to the cord 66. The application of a downward pressure to cord 66 causes the ends 58 of handle 25 to move inwardly toward each other. Additionally, this allows the handle 72 to move inwardly along the slide portion 81 of first axle member 54 and to slide inwardly along the slide surface 82 of second axle member 56. The slide surfaces 81 and 82 extend longitudinally along the axle members 54 and 56, respectively.

This movement causes the ends 58 to become clear of the stop members 60 and 62. It can be seen that the stop

5,476,282

**9**

members 60 and 62 have a width that is less than the length of the slide surfaces 81 and 82 of axle members 54 and 56. After the ends 58 have cleared the stop members 60 and 62, the handle 25 is free to rotate about axle members 54 and 56. When the handle 25 lies flat against the frame, the cord 66 is released so that the ends return to their original position.

FIG. 6 shows a detailed view of the configuration of the locking mechanism 84. Specifically, handle 25 has a hole 85 formed therethrough which receives the outer diameter 86 of axle member 56. End 87 of axle member 56 is rigidly fastened to frame portion 70. The axle member 56 can be welded, bolted, or otherwise rigidly fastened to the frame portion 70. The outer diameter 86 of axle member 56 forms a slide surface for the end 58 of handle 25. As such, the handle 25 is free to slide over the outer diameter 86 of axle member 56. A cap 88 is fastened to the far inward end of axle member 56. Cap 88 includes an abutment surface 89 which prevents further travel of handle 25 along slide surface 86 of axle member 56. The cord 90 is received by end 58 of handle 25. Cord 90, identified herein as a "pulling means", is fastened to the interior 91 of handle 25 by placing a crimping member 92 about the outer diameter of cord 90. Cord 90 extends from interior 91 through opening 93 at end 58 of handle 25.

This locking mechanism is unique to the present invention and further enhances the capabilities of the present invention. In particular, a simple downward motion on the cord 66 allows the handle to move from its first position to its second position. This can be done in a minimum of time. Additionally, the arrangement of the locking mechanism provides a rigid well-distributed structural support for the vertical position of the handles. This locking mechanism is placed on each end of the cart 10. It can be used for both handles.

FIG. 7 illustrates a detailed cross-sectional view of the circled area A of FIG. 1. In particular, FIG. 7 illustrates the offset relationship of the longitudinal member 29 with respect to the forward portion 37 of the frame 11. As can be seen, the frame 11 is made up of square tubular material. The first portion 37 supports the handle 25a thereon. The longitudinal member 29 has an end 35 positioned in proximity with the top surface 100 of the frame portion 37. Importantly, a bracket 102 has a side which is welded to an inner side 104 of frame portion 37. The bracket 102 is an L-shaped member which includes a surface 106 extending rearwardly of the frame portion 37. The portion 106 lies in a generally horizontal configuration and to the back of the top surface 100 of the frame portion 37. The longitudinal member 29 is welded to the surface 106 so as to reside in offset relationship from the top surface 100 of frame portion 37. As can be seen, the end 35 is positioned apart and separate from the top surface 100 of frame portion 37. In this configuration, it is now possible for the handle 25 to be folded so as to reside juxtaposed against the top surface 100 of the frame portion 37. If the longitudinal member 29 were extended so as to be in overlying relationship with the frame portion 37, then the handle 25 would not reside in coplanar relationship within the frame 11.

Although the illustration of FIG. 7 appears to be a relatively simple modification of the cart 10 of the present invention, it does achieve important results. The inclusion of the longitudinal member 29 was carried out to add extra structural stability and support to the frame 11. However, it was important to avoid the sacrifice of the perfectly flat arrangement of the handles 25 and 25a. The end 35 of the longitudinal member was required to reside in a position that would enhance the structural stability of the frame 11 while providing a proper space for the folding of handle 25. The

**10**

arrangement of FIG. 7 accommodates this difficult problem.

FIG. 8 shows at 110 the cross-sectional configuration of the longitudinal member 29 as shown in circled area "B" of FIG. 2. As can be seen, the longitudinal member 29 has a first portion 112 slidably receiving a second portion 114. The first portion 112 is affixed to the first U-shaped member of the frame. The second portion 114 is affixed to the other U-shaped member of the frame. The second portion 114 is telescopically received within the first portion 112 so that the length of the longitudinal member 29 can be properly adjusted and set. The second portion 114 has a snap button 116 positioned within the first portion 112 adjacent an end 118 of the second portion 114. As can be seen, the first portion 112 has an opening 120 formed adjacent to end 122 on the bottom surface of the portion 112. The second portion 114 has a hole 124 extending through a bottom adjacent to the end 118 of the second portion 114. The snap button 116 has a head 126 that is received within the hole 124 of the second portion 114. As can be seen, the head 126 of the snap button 116 engages the opening 120 of the first portion 112 when the hole 116 aligns with the opening 120. The snap button 116 is a flexible member having an end 128 in surface-to-surface contact with an interior of the second portion 114. A tensioning portion 130 extends from the end 128 so as to cause the head 126 to be in compressive contact with the interior of the first portion 112.

In normal use, when the second portion 114 telescopes outwardly relative to the first portion 112, the hole 124 will come into alignment with the opening 120. When this occurs, the tensioning member 130 of the snap button 116 will cause the head 126 to pass into and through the opening 120. The positioning of the head 126 essentially acts as a "stop" to the movement of the second portion 114 with respect to the first portion 112. As a result, the extended movement of the frame 11 is effectively limited. When it is desired to retract the frame, the head 126 can be pressed inwardly so as to allow the second portion 114 to be moved inwardly. The arrow in FIG. 8 illustrates the movement of the head 126 when it is desired to compress the frame.

The arrangement illustrated in FIG. 8 is particularly important to the operation of the cart 10 of the present invention. In previous embodiments of the present invention, it was found that when the frame is in the form of a hand truck (as illustrated in FIG. 2), the telescoping portions of the frame would separate. Often, the user of the cart 10 would forget to close the thumbnuts 21 or would not rotate the thumbnuts 21 with enough locking force. Occasionally, when the cart would be pulled upstairs, the sections would separate. As a result, it was necessary to incorporate a stop mechanism so as to prevent the inadvertent separating of the sections of the cart. The snap button 116 was provided so as to effectively safeguard against such separation. The snap button 116 also serves to inform the user when the limit of extension of the cart has been reached. This avoids the annoying situation where the sections accidentally separate.

The foregoing disclosure and description of the invention is illustrative and explanatory thereof. Various changes in the details of the illustrated construction may be made within the scope of the appended claims without departing from the true spirit of the invention. The present invention should only be limited by the following claims and their legal equivalents.

I claim:

1. A convertible cart for transporting objects comprising:
   a frame having a first end frame member and a second end frame member opposite said first end frame member,

5,476,282

| 11 | 12 |

said frame having a first side frame member and a second side frame member extending between said first and second end frame members, said first and second side frame members being extendible, said frame having a generally rectangular configuration, said frame having a longitudinal member extending centrally of said frame, said longitudinal member having a first end affixed to said first end frame member and an opposite end affixed to and offset from overlapping relationship with said second end frame member of said frame, said opposite end of said longitudinal member being affixed to a bracket, said bracket being affixed to and extending inwardly from said second end frame member of said frame, said longitudinal member being movable between an extended position and a retracted position;

a first U-shaped handle having free end portions pivotally connected to said first and second side frame members adjacent said first end frame member;

a second U-shaped handle having free end portions pivotally connected to said first and second side frame members at a position above said second end frame member, each of said first and second handles being selectively movable between a first position generally perpendicular to said frame and a second position generally aligned with said frame, said first handle being in coplanar relationship with said first and second side frame members and having a transverse portion overlying said second end frame member when in said second position and when said longitudinal member is in said retracted position; and

a plurality of wheels attached to said frame, said plurality of wheels being positioned adjacent said first and second side frame members of said frame, said longi-

tudinal member and said side frame members having a top surface positioned a greater vertical distance from a bottom surface of said wheels than a top surface of said first and second end frame members.

**2.** The cart of claim **1**, said frame having a first stop member fastened to said frame adjacent said first handle, said frame having a second stop member fastened to said frame adjacent said second handle, said first and second stop members being in abutment with said first and second handles when said handles are in said first position.

**3.** The cart of claim **2**, said frame having a first axle member in engagement with said first handle, said frame having a second axle member in engagement with said second handle, said first handle rotatable between said first and second positions about said first axle member, said second handle rotatable between said first and second positions about said second axle member.

**4.** The cart of claim **3**, said first and second axle members extending inwardly of said frame, said free end portions of said first handle being slidable along a surface of said first axle member, said free end portions of said second handle slidable along a surface of said second axle member.

**5.** The cart of claim **4**, each of said first and second handles having a flexible cord connected to opposite ends of said U-shaped configuration, said cord extending across said U-shaped configuration of each of said handles.

**6.** The cart of claim **1**, further comprising:

a stair climber frame member fastened to an underside of said frame adjacent at least one pair of said wheels, said stair climber frame member extending generally diagonally from said wheel to said frame.

*   *   *   *   *

EXHIBIT A                          Page 11 of 11

EXHIBIT B



US005228716A

# United States Patent [19]

## Dahl

[11] **Patent Number:** 5,228,716

[45] **Date of Patent:** Jul. 20, 1993

[54] **CONVERTIBLE TRANSPORT CART**

[76] Inventor: **Gary-Michael Dahl,** 8300 Sands Pointe Dr. #903, Houston, Tex. 77036

[21] Appl. No.: **762,568**

[22] Filed: **Sep. 17, 1991**

[51] Int. Cl.⁵ ............................................ **B62B 3/02**
[52] U.S. Cl. ................................. 280/651; 280/47.18; 280/47.29; 280/47.34
[58] Field of Search ................. 280/47.18, 47.29, 655, 280/655.1, 651, 638, 35, 47.27, 47.34, 47.2

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,662,730 | 3/1928 | Wertenberger . | |
| 2,263,879 | 11/1941 | Jorgensen | 280/5.24 |
| 2,519,113 | 8/1950 | Cohn | 280/49 |
| 2,620,041 | 12/1952 | Chenette | 180/9.1 |
| 2,820,643 | 1/1958 | Cohn | 280/34 |
| 3,104,890 | 8/1963 | Hill | 280/34 |
| 3,206,790 | 9/1965 | Romay | 16/35 |
| 3,423,103 | 1/1969 | Maltarp | 280/655.1 |
| 3,759,538 | 9/1973 | Fabiano | 280/47.35 |
| 3,761,107 | 9/1973 | Doeherty | 280/348 |
| 3,837,667 | 9/1974 | Sernovitz | 280/47.34 |
| 4,009,891 | 3/1977 | Jensen | 280/657 |
| 4,448,440 | 5/1984 | Gier | 280/655 |
| 4,637,626 | 1/1987 | Foss | 280/655 |
| 4,717,168 | 1/1988 | Moon, Sr. | 280/641 |
| 4,796,909 | 1/1989 | Kirkendall | 280/651 |
| 4,902,027 | 2/1990 | Skelly | 280/33.998 |

### FOREIGN PATENT DOCUMENTS

294294A 12/1988 European Pat. Off. .

*Primary Examiner*—Margaret A. Focarino
*Assistant Examiner*—Michael Mar
*Attorney, Agent, or Firm*—Harrison & Egbert

[57] **ABSTRACT**

A convertible cart for transporting objects having a frame, a first handle connected to the frame, a second handle connected adjacent an opposite end of the frame, a pair of primary wheels attached to the frame, and at least one secondary wheel attached to an opposite end of the frame. Each of the handles is selectively movable between a first position generally perpendicular to the frame and a second position generally aligned with the frame. The primary wheels and secondary wheel support the frame at a position parallel to the surface on which the wheels are placed. A locking mechanism is provided for the handles which includes a first and second axle members extending inwardly on opposite sides of the frame, a first stop member fastened to the frame so as to abut a surface of the handle, and a cord extending across the handle so as to cause the handle to move along a slide surface of the axle members.

**11 Claims, 3 Drawing Sheets**



EXHIBIT B                    Page 1 of 9

**U.S. Patent**          July 20, 1993          Sheet 1 of 3          **5,228,716**



FIG. 1

FIG. 2

FIG. 3

**U.S. Patent**          July 20, 1993          Sheet 2 of 3          **5,228,716**



FIG. 4



*FIG. 5*



*FIG. 6*

5,228,716

1

# CONVERTIBLE TRANSPORT CART

## TECHNICAL FIELD

The present invention relates to hand trucks, dollies, and other land vehicles. More particularly, the present invention relates to lightweight, telescoping foldable and convertible hand trucks and/or platform carts which are used for transporting objects.

## BACKGROUND ART

Many improvements have been made in the area of hand trucks and dollies for material handling. However, none of these improvements have efficiently and effectively addressed the needs of professional musicians. Professional musicians are required to transport wide varieties of musical instruments and related gear often utilizing small cars and trucks over various terrains and changing environments while travelling to and from performance sites. Due to the virtual explosion in technology over the last ten years regarding P.A. systems, electronic keyboards, effects and the like, musical groups require more equipment than ever before. The problems of transporting the above-mentioned equipment have become increasingly difficult. It is desirable to create a specialized dolly or cart that can satisfy the criteria of musicians.

In the past few years, mini-vans have been placed in common use for the transport of musical and other equipment. As such, space limitations have become of great concern to musicians. Any transport carts must now have a size which can carry large loads yet collapse to a small storage size so as to leave maximum room for equipment with the mini-van. Space is at a premium within a mini-van.

Initially, it is desirable to produce a lightweight cart weighing under thirty-five pounds. It has been found that professional musicians experience finger stiffening and muscle stiffening in the hands and forearms when lifting objects over forty pounds which is deleterious to musical performance. In addition, the carrying of heavy equipment can contribute to health problems and related physical impairment. In addition, it also tights laryngeal muscles and, thus, hampers singing performance.

When transporting musical equipment, any cart or dolly should be capable of supporting five hundred pounds or more. Musical equipment is delicate and should be transported smoothly and without shock. In addition, the musical equipment should be properly supported and handled with care. Any handtruck or dolly must be able to reduce to a size of three feet of length or less so as to facilitate receipt in small car trucks and/or baggage handling in airports.

In order to effectively accommodate keyboards and large P.A. cabinets, a cart must have the ability to extend to approximately fifty-four inches. It should also be short enough to maneuver through labrynth-like corridors and elevators, often found in hotels and stage areas. Support should be provided on each end of the cart so as to maintain the expensive and delicate equipment within the confines of the frame of the dolly. Tall foldable sides can be useful for securing equipment such as drums, guitars, horns and the like, as well as acting as a hanger for various stage clothes.

Since the equipment must be transported over various terrains, the cart should have the quality suitable for rolling smoothly and shock-free over such various terrains. The wheeled mechanism of the dolly or cart

2

should be suitable for traversing curbs, stairs, grass, dirt and rough pavement. The cart should provide a broad frame surface so as to easily receive the musical equipment. A non-skid surface is useful in order to prevent odd-shaped instruments and widely-used polyethylene cases (which are notoriously slippery) from slipping and falling off during transport. The cart should be able to be converted from a two-wheel hand truce to a four-wheel cart both extremely quickly and efficiently. Since the cart must be loaded and unloaded often during a musical performance, complete assembly into loading configuration should be completed within seven seconds.

It is often the requirement of musicians that they must set up extremely quickly and must break down the equipment quickly. As such, it is a requirement for a musical instrument transport cart that the cart be able to be assembled into its proper position for receiving equipment both quickly and easily. Undue manipulation of screws, nuts, bolts, and other items wastes a great deal of time and is generally unsuitable for the purposes of the musician. A musical instrument transport cart must be capable of rapid assembly. The cart should also be capable of assuming any configurations within seven seconds or less.

A caster brake is necessary so as to allow the cart to be retained on uneven surfaces.

It is also important for musical equipment to be maintained on a surface parallel to the surface on which the cart is travelling. As such, the frame of the cart should be supported on wheels which maintain the frame in parallel relationship to the earth. Any angling of the frame will tend to cause the equipment to move to the lowest end of the cart. The angling may also cause excessive and unexpected pressures to be applied to cart components. In order to enhance the ability to maintain the parallelism of the cart to the surface, the handle should be foldable in such a way so as to maintain this parallelism.

Various patents have issued in the past which deal with various types of collapsible hand trucks and dollies. U.S. Pat. No. 1,662,730, issued on Mar. 13, 1928, to Wertenberger et al. shows a stylized truck having a broad surface with suitable caster wheels for transporting bathtubs. U.S. Pat. No. 2,519,113, issued on Aug. 15, 1950, to L. I. Cohn shows a hand truck having a collapsible handle at one end, a stair climbing apparatus, and an adjustable frame. U.S. Pat. No. 2,620,041, issued on Dec. 2, 1952, to Chenette et al. shows a truck having a treaded stair climbing attachment. U.S. Pat. No. 2,820,643, issued on Jan. 21, 1958, to L. I. Cohn shows a hand truck and dolly having an adjustable handle for converting the truck into a dolly. U.S. Pat. No. 3,104,890, issued on Sep. 24, 1963, to N. Hill shows a utility cart having telescoping tubular frame members U.S. Pat. No. 3,206,790 issued on Sep. 21, 1965, to C. Romay describes a locking assembly for a swiveled caster as used on trucks and other carts. U.S. Pat. No. 3,759,538, issued on Sep. 18, 1973, to A. J. Fabiano illustrates a mobile storage facility having wheels and handles for supporting a tray for garden implements, accessories, and supplies. U.S. Pat. No. 3,761,107, issued on Sep. 25, 1973 to Dochery et al shows an adjustable dolly for supporting furniture thereon. U.S. Pat. No. 3,837,667, issued on Sep. 24, 1974, to M. A. Sernovitz shows an open-framed cart for receiving containers stacked in a nested relationship. U.S. Pat. No. 4,009,891,

5,228,716

**3**

issued on Mar. 1, 1977, to O. Jensen provides a hand truck and dolly with an adjustable frame and support chassis. U.S. Pat. No. 4,448,440, issued on May 15, 1984, to R. H. Gier discloses a hand truck having a load supporting platform pivotted to swing from an operative position to a position flush against the frame. U.S. Pat. No. 4,637,626, issued on Jan. 20, 1987, to Foss et al. shows a portable, foldable and convertible luggage trolley. U.S. Pat. No. 4,717,168, issued on Jan. 5, 1988, to J. R. Moon discloses a utility cart having a pair of balloon tire wheels supporting a frame counterbalanced for easy pushing. A pair of caster wheels are provided on the front of the inclined frame. U.S. Pat. No. 4,796,909, issued on Jan. 10, 1989, to V. S. Kirkendall describes a four wheeled pull-type service cart designed to transport heavy loads over sandy terrain. European Patent No. 294,249 shows a dolly having a detachable tubular structure which provides an extendible platform.

It is an object of the present invention to provide a convertible cart designed to be use in combination with the transport of musical equipment.

It is an object to provide a cart that will carry up to five hundred pounds, will extend to fifty-four inches in length, weigh less than thirty-five pounds, and collapse to thirty-six inches in length for storage, be durable, and be relatively inexpensive.

It is another object of the present invention to provide a telescoping and collapsible cart for easy storage.

It is another object of the present invention to provide foldable handles having a sufficient height to allow for efficient stacking and carrying of delicate musical equipment as well as for allowing for easy storage.

It is a further object of the present invention to provide a locking mechanism for the handles of a cart which allows the handles to be positioned within one second each.

It is a further object of the present invention to provide a cart having handles and a frame that can be arranged so as to maintain a parallel relationship with the earth.

It is still a further object of the present invention to provide a cart that can be easily transported through airports and the like by having a folded length of three feet or less and a flat side for airport transport belts.

It is another object to provide a cart that has minimal protrusions for the prevention of snagging, scraping, and injury.

These and other objects and advantages of the present invention will become apparent from a reading of the attached specification and appended claims.

## SUMMARY OF THE INVENTION

The present invention is a convertible cart for transporting objects which comprises a frame, a first handle connected to the frame adjacent one end of the frame, a second handle connected to the opposite end of the frame from the first handle, a pair of primary wheels attached to one end of the frame, and at least one secondary wheel attached to the opposite end of the frame. Each of the first and second handles is selectively movable between a first position generally perpendicular to the frame and a second position aligned with the frame. The wheels support the frame in a position parallel to the surface on which the wheels are placed.

The frame comprises a first U-shaped member and a second U-shaped member slidably engaging the first U-shaped member. The first and second U-shaped mem-

**4**

bers are movable relative to each other for changing a length of the frame. A locking member is fastened to one of the U-shaped members so as to selectively engage the other of the U-shaped members. Specifically, a thumbnut is threadedly fastened to one of the U-shaped members on an underside of the frame. This thumbnut is rotatable to a position in abutment with the other of the U-shaped members.

The frame has a first stop member fastened to the frame adjacent to the first handle. The frame also has a second stop member fastened to the frame adjacent to the second handle. The first and second stop members are in abutment with the first and second handles when the handles are in the first position. The frame has a first axle member in engagement with the first handle. A second axle member is also connected to the frame for engagement with the second handle. The first handle is rotated between the first and second positions about this first axle member. The second handle is rotatable between the first and second positions about the second axle member. These axle members extend inwardly from the frame. Each of the axle members has a slide surface which allows the handle to slide longitudinally thereacross. Each of the first and second handles has a U-shaped configuration. A flexible cord extends between the ends of the handle so as to allow the handles to slide on the axle members.

The pair of primary wheels are pneumatic wheels. The secondary wheels are two pivotting caster wheels provided on opposite sides of one end of the frame. A lock is provided for selectively preventing rotation of the caster wheels.

A stair climber frame member is fastened to an underside of the frame adjacent to the primary wheels.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the present invention illustrating the expanded operable position for use as a dolly.

FIG. **2** is a perspective view of the present invention illustrating the configuration of the present invention as a two wheeled hand truck.

FIG. **3** is a perspective view of the present invention showing the handles in their collapsed position.

FIG. **4** is an end view of the cart of the present invention showing, in particular, the configuration of the locking mechanism.

FIG. **5** is an end view similar to FIG. **4** showing, in particular, the workings of the locking mechanism.

FIG. **6** is a detailed view, in cross-section, of the locking mechanism of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

With reference to the drawings, FIG. **1** illustrates the present invention in its fully extended position. The frame **11** of cart **10** is made of preferably a mild square tubular steel which is structurally light. The frame **11** is comprised of slidably cooperating U-shaped square tubing divided into two sections. The main frame bed **12** and the telescoping frame section **13** are provided so as to form the frame **11**. Telescoping frame section **13** slidably engages the main frame **12**. The frame **11** may be welded or bonded by mechanical means such as by bolts **14**. The main frame bed **12** includes a non-skid surface **19** for reduced possibility of accidental slipping of equipment.

5,228,716

5

A stair climber attachment 15 is secured to the lower end of the main frame bed 12. The stair climber attachment 15 includes axle 16 for supporting two primary pneumatic wheels 17 and also serving as a lateral support bar 18 for bracing the main frame bed 12. Another lateral support bar 20 is placed where the telescoping frame section 13 and the main frame bed interconnect. This reinforces the mid-section of the frame 11. Additional reinforcement is provided by the use of heavy duty thumbnuts 21. The thumbnuts 21 are threadedly received on the underside of main frame bed 12 on each side of the frame bed. Thumbnuts 21 can be rotated so as to move in abutment with the telescoping frame section 13. This serves to lock the telescoping frame section 13 in position relative to the main frame bed 12. The thumbnuts 21 are located on the underside of the main frame bed 12 so as to avoid snagging of equipment or objects located on the top or sides of the cart 10.

A brace 22 extends down from and is attached to the front or top end of the telescoping frame section 13. Brace 22 is of a suitable size to serve as a support 23 for the secondary wheels 24. Secondary wheels 24 are preferably pivoting casters for ease in direction change. Brace 22, in combination with secondary wheels 24, allows for uniform balance of the front and back of cart 10.

Inverted U-shaped equipment support handles 25 are symmetrically placed on opposite ends of frame 25. The equipment support handles 25 are releasably attached to the frame by suitable hinges 26 for ease in collapsing equipment support handles 25. The handles 25 are also locked into place by suitable mechanical means, to be described hereinafter in conjunction with FIGS. 4–6.

Each of the handles 25 is supported on axle members 27. Handles 25 can rotate about axles 27 from a first position to a second position. The first position of handles 25 is illustrated in FIG. 1. Handles 25 are in a position perpendicular to the frame 11 of cart 10. The second position of handles 25 is shown in FIG. 3 in which the handles 25 are rotated about axles 27 so as to assume a position parallel to and aligned with the frame 11. The ability to rotate the handles 25 about axles 27 enhances the capabilities of the present invention. A specialized mechanism is provided for locking the handles in proper position.

In FIG. 2, it can be seen that the handle 25 is rotated about axles 27 so as to be coplanar with the frame 11. The handle 25 is contained within the perimeter formed by frame 11. The other handle 25 is placed in its first position perpendicular to the frame 11. In the position illustrated in FIG. 2, the cart 10 assumes a hand truck configuration.

FIG. 3 illustrates the cart 10 in its configuration as a four-wheel flatbed cart. In FIG. 3, the handles 25 are both rotated about axles 27 so as to be placed in their second position. The second position is a flat position on the frame 11. It can be seen that one handle 25 is received within the area of frame 11 and is generally coplanar with the area of frame 11. The other handle 25 is hinged to axles 27 slightly above the top surface of frame 11. This causes the other handle 25 to assume a position juxtaposed against the top surface of frame 11 and arranged parallel to frame 11. In either of the configurations, the top surface of the cart 10 of the present invention will be flat and parallel to the surface upon which the cart 10 rests.

The stair climber attachment 15 supports the frame 11 a distance above pneumatic wheels 17. Similarly, the

6

brace 22 and the support 23 supports the frame 11 a distance above the caster wheels 24. It is important to the embodiment of the present invention that the frame 11 be supported so as to be parallel above the surface upon which the cart 10 rests. As such, the structural members are configured so as to provide this levelling of the frame 11 above the wheels. The primary wheels 17 are positioned on opposite sides of frame 11. Similarly, the caster wheels 24 are placed on opposite sides of frame 11. The pneumatic wheels 17 allow the cart 10 to be moved along various types of terrain. The pneumatic wheels 17 allow the cart to be moved without shock to the contents on the frame 11. The wheels 17 can be inflated to assure desired pressure.

The use of the mild durable square tubular steel material is, by structural design, light enough in weight to be manually lifted onto a truck or into an automobile trunk. It is also structurally sound enough to withstand and support as much as 500 pounds of equipment. The overall empty weight of the cart 10 should not exceed forty pounds. The square tubular steel is preferred because it allows for a larger surface area on the frame 11 than does rounded tubing. Non-skid adhesive tape, or the like, is applied to the top surface of the main frame bed 12 so as to reduce the possibility of equipment slipping from the cart.

The telescoping frame 11 allows for compact storage when the cart 10 is not in use. This is important given the limited space often available to musicians. The cart achieves maximum hauling capacity when the frame 11 is fully extended. The ends of the cart 10 are designed to be bilaterally symmetrical and are of sufficient height to allow for efficient stacking of musical equipment. The ends releasably collapse to the frame 11 for convenient storage. Foamed handles may be provided on the top of handles 25 for the comfort of the user.

The stair climbing device 15 is attached to the bottom of the cart 10 to aid in ascending and descending stairs. The primary wheels 17 are located at the bottom end of the cart and can used part of the stair climbing device as an axle. These primary wheels are preferably pneumatic for a smooth ride on rough terrain. The secondary wheels 24 are located on the opposite end of the cart and are preferably pivoting caster wheels for ease and direction change and maneuverability.

The lateral support bars 18 and 20 are placed perpendicular in the frame to help support equipment and reinforce the structural stability of the frame 11. The frame 11 is actually made of two separate pieces, the main frame bed 12 and the telescoping frame bed 13. The attachment of telescoping frame section 13 to the main frame bed 12 is further enhanced by the use of the heavy-duty thumbnut which affixes the sections in position relative to each other.

FIG. 4 shows an end view of the cart 10 of the present invention. FIG. 4 illustrates, in particular, the configuration of the looking mechanism 50 in accordance with the preferred embodiment of the present invention. As can be seen in FIG. 4, cart 10 includes inverted U-shaped handle 52 which is rotatably connected to axle members 54 and 56. The ends 58 of handle 52 rest in abutment against a first stop member 60 and a second stop member 62. The other side of the ends 58 of handle 52 are in abutment with crossbar 64. In this position, the handle 52 is supported in a rigid upright position. The ends 58 cannot move because of their abutment with stop members 60 and 62 and with crossbar 64. A cord 66 is fastened adjacent to the ends 58 of handle 52 and

5,228,716

**7**

extends between the ends 58 in generally close proximity to the axle members 54 and 56 and near the stop members 60 and 62.

The first axle member 54 is rigidly affixed in position and extends inwardly from frame portion 68. Similarly, the second axle member 56 is rigidly affixed in position and extends inwardly from the frame portion 70. Frame portions 68 and 70 are supported by the stair climber attachment 72. Wheel axle 74 extends beneath the frame portions 68 and 70 and is received by the stair climber attachment 72. Wheel axle 74 rotatably supports the pneumatic wheels 76 and 78. Wheels 76 and 78 rest on surface 80. It can be seen that the frame of cart 10 resides parallel to the surface 80 when the cart is in the position illustrated in FIG. 4.

FIG. 5 illustrates how the locking mechanism of the present invention actually operates so as to allow the handle 52 to move from its first perpendicular position to its position in alignment with the frame of cart 10. As can be seen in FIG. 5, a pressure is applied, either upwardly or downwardly to cord 66. The application of a downward pressure on cord 66 causes the ends 58 of handle 52 to move inwardly toward each other. Additionally, this allows the handle 72 to move inwardly along the slide portion 81 of first axle member 54 and to slide inwardly along the slide surface 82 of second axle member 56. The slide surfaces 81 and 82 extend longitudinally along the axle members 54 and 56, respectively.

This movement causes the ends 58 to become clear of the stop members 60 and 62. It can be seen that the stop members 60 and 62 have a width that is less than the length of the slide surfaces 81 and 82 of axle members 54 and 56. After the ends 58 have cleared the stop members 60 and 62, the handle 52 is free to rotate about axle members 54 and 56. When the handle 52 lies flat against the frame, the cord 66 is released so that the ends return to their original position.

FIG. 6 shows a detailed view of the configuration of the locking mechanism 84. Specifically, handle 52 has a hole 85 formed therethrough which receives the outer diameter 86 of axle member 56. End 87 of axle member 56 is rigidly fastened to frame portion 70. The axle member 56 can be welded, bolted, or otherwise rigidly fastened to the frame portion 70. The outer diameter 86 of axle member 56 forms a slide surface for the end 58 of handle 52. As such, the handle 52 is free to slide over the outer diameter 86 of axle member 56. A cap 88 is fastened to the far inward end of axle member 56. Cap 88 includes an abutment surface 89 which prevents further travel of handle 52 along slide surface 86 of axle member 56. The cord 90 is received by end 58 of handle 52. Cord 90, identified herein as a "pulling means", is fastened to the interior 81 of handle 52 by placing a crimping member 92 about the outer diameter of cord 90. Cord 90 extends from interior 91 through opening 93 at end 58 of handle 52.

This locking mechanism is unique to the present invention and further enhances the capabilities of the present invention. In particular, a simple downward motion on the cord 66 allows the handle to move from its first position to its second position. This can be done in a minimum of time. Additionally, the arrangement of the locking mechanism provides a rigid well-distributed structural support for the vertical position of the handles. This locking mechanism is placed on each end of the cart 10. It can be used for both handles.

The foregoing disclosure and description of the invention is illustrative and explanatory thereof. Various

**8**

changes in the details of the illustrated construction may be made within the scope of the appended claims without departing from the true spirit of the invention. The present invention should only be limited by the following claims and their legal equivalents.

I claim:

1. A convertible cart for transporting objects comprising:

a frame;

a first handle connected to said frame adjacent one end of said frame;

a second handle connected to said frame adjacent an opposite end of said frame from said first handle, each of said first and second handles selectively movable between a first position generally perpendicular to said frame and a second position generally aligned with said frame, said frame having a first stop member fastened to said frame adjacent said first handle, said frame having a second stop member fastened to said frame adjacent said second handle, said first and second stop members in abutment with said first and second handles when said handles are in said first position, said frame having a first axle member in engagement with said first handle, said frame having a second axle member in engagement with said second handle, said first handle rotatable between said first and second positions about said first axle member, said second handle rotatable between said first and second positions about said second axle member, said first and second axle members extending inwardly of said frame, said first handle slidable along a surface of said first axle member, said second handle slidable along a surface of said second axle member, each of said first and second handles having a U-shaped configuration, each of said first and second handles having a flexible cord connected to opposite ends of said U-shaped configuration, said cord connected to said U-shaped configuration so as to cause said handles to move along said surface of said first and second axle members;

a pair of primary wheels attached to said opposite end of said frame, each of said pair of primary wheels positioned on opposite sides of said frame; and

a second wheel attached to said one end of said frame, said primary wheels and said secondary wheel supporting said frame in a position generally parallel to a surface on which said primary wheels and said secondary wheel are placed.

2. The cart of claim 1, said frame comprising:

a first U-shaped member; and

a second U-shaped member slidably engaging said first U-shaped member, said first and second U-shaped members movable relative to each other for changing a length of said frame.

3. The cart of claim 2, further comprising:

a locking member fastened to one of said first and second U-shaped members so as to selectively engage the other of said U-shaped members.

4. The cart of claim 3, said locking member comprising:

a thumbnut threadedly fastened to one of said first and second U-shaped members on an underside surface of said frame, said thumbnut rotatable to a position in abutment with the other of said U-shaped members.

5,228,716

**9**

5. The cart of claim **1**, said pair of primary wheels being pneumatic wheels, said second wheel having at least one pivotting caster wheel.

6. The cart of claim **5**, said secondary wheel comprising first and second pivotting caster wheels, each of said first and second caster wheels having a lock fastened thereto, said lock for selectively preventing rotation of said wheels.

7. The cart of claim **1**, further comprising:

a stair climber frame member fastened to an underside of said frame adjacent said primary wheels.

8. A convertible cart for transporting objects comprising:

a frame;

a first handle connected to said frame adjacent one end of said frame;

a second handle connected to said frame adjacent an opposite end of said frame from said firsts handle, said first handle selectively movable between a first position perpendicular to said frame and a second position generally coplanar with said frame, said frame having a first axle member in engagement with said first handle, said frame having a second axle member in engagement with said second handle, said first handle rotatable between said first and second positions about said first axle member, said second handle rotatable between said first and second positions about said second axle member, said firsts and second axle members extending inwardly of said frame, said first handle slidable along a surface of said first axle member, said second handle slidable along a surface of said second axle member, each of said first and second handles having a U-shaped configuration, each of said first and second handles having a flexible cord connected to opposite ends of said U-shaped configuration, said cord for causing a movement of said first and second handles along said axle members; and

a plurality of wheels connected to said frame so as to support said frame above a surface.

9. The cart of claim **8**, said second handle movable between a first position perpendicular to said frame and a second position overlying said first handle in said second position, said second position of said second handle parallel to said frame.

10. A handle locking mechanism for a handle of a cart comprising:

a first axle member affixed to a frame of the cart, said handle rotatable about said first axle, said first axle

**10**

member having a longitudinal slide surface thereon;

a first stop member fastened to said frame so as to abut a surface of said handle, said stop member abutting said handle for a distance less than the length of said slide surface;

pulling means connected to said handle so as to cause said handle to move along said slide surface of said first axle member, said handle movable to a position free of said stop member;

a second axle member affixed to an opposite side of said frame from said first axle member, said handle rotatable about said second axle member, said second axle member having a longitudinal slide surface thereon; and

a second stop member fastened to said opposite side of said frame so as to abut another surface of said handle, said second stop member abutting said surface of said handle for a distance less than a length of said slide surface of said second axle member, said pulling means connected to said handle so as to cause said handle to move along said slide surface of said second axle member, said handle movable to a position free of said second stop member, said handle having a U-shaped configuration, one end of said U-shaped configuration in rotatable relationship with said first axle member, another end of said U-shaped configuration in rotatable relationship with said second axle member, said pulling means connected to said ends of said U-shaped configuration so as to extend thereacross, said pulling means comprising a cord affixed to opposite ends of said handle, said cord positioned in proximity to said first and second axle members.

11. The mechanism of claim **10**, further comprising:

a second axle member affixed to an opposite side of said frame from said first axle member, said handle rotatable about said second axle member, said second axle member having a longitudinal slide surface thereon;

a second stop member fastened to said opposite side of said frame so as to abut another surface of said handle, said second stop member abutting said surface of said handle for a distance less than a length of said slide surface of said second axle member, said pulling means connected to said handle so as to cause said handle to move along said slide surface of said second axle member, said handle movable to a position free of said second stop member.

\* \* \* \* \*

EXHIBIT C



EXHIBIT C                                        Page 1 of 2



© Copyright 2008 Multi-Cart® All Rights Reserved.

EXHIBIT C      Page 2 of 2

EXHIBIT D

Int. Cl.: 12

Prior U.S. Cls.: 19, 21, 23, 31, 35, and 44

## United States Patent and Trademark Office

Reg. No. 2,177,291

Registered July 28, 1998

## TRADEMARK
### PRINCIPAL REGISTER



DAHL, GARY-MICHAEL (UNITED STATES CITIZEN)
8300 SANDS POINT DR. #903
HOUSTON, TX 77036 DAHL, GARY-MICHAEL (UNITED STATES CITIZEN)

8300 SANDS POINT DR. #903
HOUSTON, TX 77036

FOR: CARTS FOR TRANSPORTING AND HAULING OBJECTS , IN CLASS 12 (U.S. CLS. 19, 21, 23, 31, 35 AND 44).

FIRST USE 0-0-1997; IN COMMERCE 0-0-1997.

THE MARK CONSISTS, IN PART, OF A STYLIZED CART.

SN 75–120,023, FILED 6–17–1996.

WON TEAK OH, EXAMINING ATTORNEY

EXHIBIT D                    Page 1 of 1

EXHIBIT E

# *PERFORMANCE CHAIR & ULTI-CART* PC-80 & UC-8

Whether you're playing large arenas or late night clubs, certain tools are indispensible for helping you make the mos of your time on stage. Meet the new Performance Chair and Ulti-Cart by Ultimate Support. The PC-80 Performanc Chair is a fully adjustable, sturdy chair that excels in comfort for stage performance. The UC-80 Ulti-Cart is a incredibly rugged multi-use cart for super simple load in and load out. Professional, indespensible tools for th gigging and performing musician.



UC-80

Reconfiguring the Ulti-Cart is easy thanks to ergonomic folding handles and levers.

Constructed of high-tensile strength steel and finished with a durable scratch resistant powder coating.

Durable, skate-style wheels for smooth operation. Locking front casters.

Easily configured as a two-wheel hand cart, or four-wheel equipment truck.

## ULTI-CART

Professional Equipment Truck and Hand Cart with Ergonomic Folding Handle and Lever and Skate-style Wheels with Locking Front Casters

## Configureable Load-in/Load-out Tool

The UC-80 Ulti-Cart can be configured as a two-wheel hand cart or a four-wheel equipment truck easily and quickly thanks to the patent-pending folding handles and levers. Amps, keyboards, speakers, you name it, the Ulti-Cart can handle up to 500 lbs of your gigging gear!

## Built To Last

Constructed of high-tensile steel and finished with a durabl scratch resistant powder coating, the UC-80 Ulti-Cart i designed to take the rigours of the road. Locking front caster super smooth skate-style wheels, and field serviceable part makes the Ulti-Cart the must-have center of your rig.

**VISIT OUR NEW WEBSITE**
www.ultimatesupport.com



ULTIMATE
SUPPORT™
LIMITED LIFETIME WARRANTY

EXHIBIT E          Page 1 of 4



**ULTIMATE SUPPORT™**

search 🔍

| Products | Ultimate Artists | Support | News | OEM | Where to Buy | Company |

Guitar Stands   Keyboard Stands   Mic Stands   Speaker Stands   Lighting Stands   Studio Stands   Benches & Chairs   Bags & Cases   JamStands

## New Product Announcements!

See us at the NAMM show, booth 6690.

the NAMM Show '10

**The following NEW products are being introduced and shown at the NAMM Show in Anaheim, California, January 14 -17. Ultimate Support is proud to be an exhibitor at the NAMM Show where we get to meet with thousands of dealers and customers and show off all our great support and music accessory products annually. The following new products will be available in the first half of 2010. For pricing and availability on these and all Ultimate Support products, be sure to check in with your favorite music store.**

### APEX AX-48 Pro
Professional Column Keyboard Stand with Two Height-adjustable Tiers and Tri-T Base

Replacing the original APEX keyboard stand is the all-new APEX AX-48 Pro! While the footprint has not changed from the original, the APEX AX-48 Pro features a modern design that takes a nod from its big brother, the flagship APEX AX-90, with a sleek oval column design. The new AX-48 Pro still boasts two sets of height-adjustable support arms that hold up to 125 lbs each, but now one set is 13" in depth to hold slimmer keyboards, controllers, and synths while the other set is 18" in depth to securely accommodate today's larger keyboard workstations and stage pianos.

The APEX AX-48 Pro has been upgraded with a new cap design featuring a professional "piano-style" hinge for longevity, and a Modular Accessory Mount (MAM) for accessories such as microphone boom arms and laptop stands. As with the original APEX, the support arms and legs can be safely and securely stored inside the APEX AX-48 Pro column, making it the most mobile keyboard stand on the market.

### GS-10 Pro and GS-10
Gensis Series Guitar Hangers with GS-1000 and GS-100 Style Yokes – Wall or Slatwall Mounts

The GS-10 Pro and GS-10 are both guitar hangers and are available in two models: wall-mounted and slatwall-mounted versions. While most guitar hangers sit perpendicular to the wall, the GS-10 and GS-10 Pro are set at an additional 15 degrees above perpendicular, making them more secure than competing products.

The GS-10 Pro features the innovative self-closing yoke found on the best-selling GS-1000 Genesis Series guitar stand. When placed in the GS-10 Pro, the weight of an acoustic, electric, or bass guitar automatically and gently closes the yoke around the headstock, cradling it safely and securely. The GS-10 features the hanging-style yoke found on the industry standard GS-100 and GS-200 Genesis Series guitar stands. The GS-10 will securely hold and display an acoustic, electric, or bass guitar by the headstock while the proven safety strap provides final protection.

### MS MKII Series
Second Generation Column and Desktop Studio Reference Monitor Stands

EXHIBIT E                    Page 2 of 4

adjustable base that allows the end user to fin tune the sweet spot. The MS-90 is a column monitor stand that features three internal channels – two for audio and power cables and another larger channel for shot or sand. The MS-100 combines the MS-80 and MS-90 into one.

From top to bottom, all three MS MKII Series stands offer sonic isolation and decoupling components. Acoustic foam and stabilizing pads on top, two rubber couplers between the column and the top/bottom plates, and spike decoupling designs under the top and bottom base plates.



## Performance Chair
Comfortable, Adjustable Performance Chair with Built-in Foot Rest and Tip-resistant Design

The PC-80 Performance Chair is tuned to offer maximized stability and comfort. It marries high-quality functionality and high-class fashion with a strong and sturdy base, fully adjustable seat back and seat, and a stunning design that looks amazing on stage. The seat back, seating surface and foot rest on the PC-80B are all fully height adjustable for optimized performance and comfort.

The PC-80B performance chair features a strong horizontal double-legged base that creates an extremely strong and stable structure for increased tip resistance and improved center of gravity over three-legged chairs and wobbly four-legged bar stools. The back and seat rest surfaces on the PC-80B are constructed from super comfortable high-density foam and are contoured for even more comfort. The foot rest has a non-slip surface for a reliable grip while performing and the spring-loaded locking pins keep surfaces and foot rest secure with no slipping.



## Ulti-Cart
Professional Equipment Truck and Hand Cart with Ergonomic Folding Handles and Skate-style Wheels with Locking Front Casters

The UC-80 Ulti-Cart can be configured as a two-wheel hand cart or a four-wheel equipment truck easily and quickly thanks to the patent-pending folding handles and levers. Amps, keyboards, speakers, you name it, the Ulti-Cart can handle up to 500 lbs of your gigging gear!

Constructed of high tensile steel and finished with a durable scratch-resistant powder coating, the Ulti-Cart is designed to take the rigors of the road. Locking front casters, super smooth skate-style wheels, and field serviceable parts make the Ulti-Cart the must-have center of your rig.



## Drum Stick Bags
Large and Regular Sized Stick Bags with Internal and External Storage and Retractable Handles

The Hybrid • Stick Bag and Series ONE • Stick Bag are constructed from high-quality materials (1900D Poly and 800D Dobby respectively) and feature a ton of internal and external storage pockets for sticks, mallets, brushes, pens, sheet music, and many other things. The internal tiered pockets and highly-visible elastic binding offer quick and easy access to your gear while the external elastic cord and clip attachment system enable you to place your stick bag wherever you need it!

The Hybrid • Stick Bag is water resistant and designed to handle whatever your tour can throw at it. It's large enough to carry all your sticks and mallets as well as sheet music and a small laptop in the external EVA pocket. There's nothing "common" about the Hybrid • Series ONE bag besides the size. Quality construction, top-grade materials, and plenty of smart storage give this bag high marks.



## Ultimate Drum Key
Custom Drum Key with Retractable Zinger and Padded, Mountable Case





Ultimate Support Systems © Copyright 2009 All Rights Reserved.

Comprising a nice sized, ergonomic custom drum key, case and zinger, the Ultimate Drum Key package is a must-have for any contemporary drummer. The case has a Velcro strap on the back that allows you to attach it wherever you wish on your kit or drum, then tune the heads on the fly without fear of losing the key – the retractable zinger will keep tabs on it for you! Finally, a drum key that combines form, fashion, and innovation!

EXHIBIT F



EXHIBIT F                    Page 1 of 5





# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV10- 551 SJO (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gary-Michael Dahl, an individual,<br><br>PLAINTIFF(S)<br><br>v.<br><br>Swift Distribution, Inc. d/b/a Ultimate Support Systems, Inc., a Californai corporation; Michael Belitz, an individual; Robin Slaton, an individual; Does 1-20, Inclusive<br>DEFENDANT(S). | CASE NUMBER<br><br>CV10 0551 SJO (RZx)<br><br>SUMMONS |

TO: DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Buche & Associates, P.C. _____, whose address is 875 Prospect, Suite 305, La Jolla, California 92037; Tel: 858.459.9210 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

JAN 2 6 2010

Dated: _____

By: _____

CHRISTOPHER POWERS

Deputy Clerk

SEAL

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Gary-Michael Dahl, an individual

**DEFENDANTS**
SWIFT DISTRIBUTION, INC. d/b/a ULTIMATE SUPPORT SYSTEMS, INC., a California corporation; MICHAEL BELITZ, an individual; ROBIN SLATON, an individual; DOES 1-20, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

John K. Buche; Sean M. Sullivan. Buche & Associates, PC: 875 Prospect Suite 305 La Jolla, California 92037;Tel: 858.459.9111; Fax: 858.459.9120 jbuche@buchelaw.com; ssullivan@buchelaw.com

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
US Patent Laws, 35 U.S.C. 1, et seq. - Patent Infringement

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☑ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY |  | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee |  |  | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions |  |  | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability |  |  |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property |  |  |  | ☐ 871 IRS-Third Party 26 USC 7609 |

CV10 0551

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)          CIVIL COVER SHEET          Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Texas |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Defendant Belitz: Los Angeles County<br>Defendant Swift: Los Angeles County | Defendant Slaton: State of Colorado. |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date JANUARY 25, 2010

   Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |